Johnson, Chancellor.
An injunction issued in this case to prevent the sale of the properly of The Cape Sable Company, taken in execution under a judgment obtained by Robert and John Oliver against the company, in Anne Arundel County Court. To the bill Sled, on which the injunction was ordered, the Olivers have answered; and, at the present term, the motion to dissolve the injunction was elaborately argued. Since the argument the case has been maturely considered. It is a cause of a novel description, demanding full reflection, not only from the character of the case, but from its importance in respect to the amount of property in controversy.
In the year 1812 an agreement was entered into between John Gibson, Richard Catón and others, and a company was formed to search for coal in Anne Arundel county; and, to enable the company to carry their objects into execution, Gibson, by a deed, executed on the 21st of June, 1833, conveyed several tracts of land to Charles Carroll in trust. By the agreement and deed all the interest in the land, and the works then or thereafter erected, and in the profits and emoluments were divided into sixty shares; twenty to Gibson; thirty-nine to the other persons, mentioned in the deed, and the remaining share to Gibson, to be disposed of for the common interest. Twenty-five out of the thirty-nine shares to *608 Richard Catón, and the residue to the children and grandchildren of C. Carroll, whose daughter was the wife of Catón.
Gibson, on the 20th of May, 1815, conveyed his interest to Addison Ridout and Joseph Jubere in trust for Gibson and wife during their lives and the life of the survivor; and after the determination of those estates, to the use of the other complainants in the bill mentioned. John Gibson and wife are dead, the former died in 1819, the latter in 1822, by which the beneficial interest in the premises became vested in the complainants as disclosed by the bill.
By an act of the General Assembly of Maryland, passed in the year 1818, the company was incorporated by the name of The Cape Sable Company. As so large a portion of the stock of this company was owned by Caton, and his connexions, lest the affairs of the corporation should be completely in their power, and all the property subject to their control, and to their disposal, the- act directs the manner in which the affairs of the company shall be conducted; to wit: by a president, two directors, and an agent. It vests in the corporation the power ‘to sell and dispose of their property, to mortgage the same or any part thereof with the consent of three-fourths of the stockholders, holding three-fourths of the shares, for securing of any loan or debt.5 The act of incorporation authorizes the company to make by-laws, &c.; but, lest the funds of the company should, by a majority, be applied to other objects than those in view, at the passage of the law, it provides, that ‘the company shall engage in no other manufacture,, except that of alum and copperas, without the consent in writing of three-fourths of the stockholders, holding three-fourths of the shares. (b)
On the 6th of August, 1822, Addison Ridout, Joseph Jubere, and the other complainants in this cause, the persons beneficially entitled to the property under the deed of trust from John Gibson, filed a bill in this court against The Cape Sable Company, Charles Carroll, Richard Caton, Alexander Mitchell and William McMechen, for an account of the profits of the company, and for the payment of what might appear due to them. This bill and the exhibits filed therewith are parts of the present bill. To that bill no answer has yet been made.
On the 29th of November, 1822, Richard Catón, one of the defendants to the first bill, and called on by it to give an account *609 of the state of the concerns in lieu of furnishing that account, wrote to a practising attorney of Anne Arundel county, as follows: ‘I hereby authorize Alexander Contee Magruder, Esq. to appear to a suit to be docketed in Anne Arundel County Court, in the name of Robert and John Oliver on the within Nar. and to confess judgment thereon. Baltimore, 29th Nov’r, 1822. Richard Caton, Pres’d’t of the A. & Copp’s Co. of Cape Sable.’ In virtue of this authority, the following note was made. ‘Enter my appearance for def’t and a judgment as above. A. C. Magruder, for def’t.’ In virtue of this authority, on the 9th December, 1822, at the adjourned October term, a suit was docketed as follows: ‘Robert Oliver and John Oliver vs. The Cape Sable Company. Case Nar. Docketed by consent. Errors released. Judgment for $30,000 cur’t money, damages and costs. To be released on payment of $17,000, cur. money, with interest thereon from the 20th day of February, 1822, and costs.’ No account was filed in the cause; and all the authority for the jugdment is as disclosed. Immediately on obtaining a judgment, a fieri facias issued; and the whole property of the company, real and personal, is taken in execution; and on the 14th of the same December advertised by the sheriff to be sold on the 6th of January then ensuing, for cash.
On the 4th of January, two days previous to the time fixed on for the sale, the present bill was filed, which states the facts here related; and that no notice of the demand was given to your orators who represent the interest of John Gibson, who was entitled to one-third of the stock of the company; no opportunity was offered them of contesting it; but in pursuance of an arrangement entered into between Caton and the plaintiffs, the proceedings mentioned took place. That at the time the judgment was given, with such eager precipitation, the manufactories were carried on by the company, yielded such great profits, that the debt, if really due, would have been satisfied, if the usual course, which precedes the obtension of judgments, had been pursued. The bill also states, that Caton, combining and confederating with Robert and John Oliver to injure and defraud, and with a view of placing beyond their reach the property caused the judgment and proceedings.
To this bill, as well as the first, Richard Caton, against whom such serious charges have been made, has not answered.
Robert and John Oliver, in their answer, admitting the judgment, deny that in entering the said judgment there was any illegal confederation or fraud on the part of those respondents, or as far *610 as they know, on the part of any other person; so far from it, they positively aver, that the whole amount for which the judgment was entered was, at the time of entering the same, and still is justly and fairly due. The answer states, that at the instance of Richard Caton, he being legally constituted president, they loaned to the company, at different times, several sums of money, amounting in the whole to the sum of $17,000, on the 20th February, 1822, under an engagement entered into by Caton with them, he being fully authorized to make such engagements, that the said company would render them secure by giving them a judgment against the company. That the pecuniary embarrassments of the company, at the time when the advancements were made, were such, but for them, an entire stop must have been put to their proceedings, to the great loss and injury of all concerned. The only likely way to better their condition was to procure loans on the faith of the property; that they authorized their president to enter into such loans, and to pledge, if necessary, the funds of the company; that the loans never would have been made if such security had not been obtained; or some other good and sufficient indemnity; without the loans the company must have come to a stop.
Several questions present themselves, arising from the facts disclosed by the bill and answer. First. Admitting that the whole sum of money was loaned, could the defendants Robert and John Oliver have supported an action of assumpsit at law, and obtained a judgment, if the claim had been contested, and the opinion of the court taken thereon ? Second. If it was competent for the defendants Robert and John Oliver to have sustained a suit on an action commenced and conducted in the usual manner, is the authority, that was given by Richard Caton such as to authorize the entering of the present, judgment? Third. Ought the injunction to be dissolved without the answer of Caton, supposing the opinion in the two preceding points to be favourable to the defendants ?
In forming an opinion in this cause I deem it unnecessary to review the various decisions, how far a corporate body can contract; except under the corporate seal. That subject was fully and maturely considered in the case of The Rank of Columbia against Patterson, and is ably treated in the opinion of the Supreme Court of the United States, as delivered by Judge Story, (c) It *611 was also under the consideration of the Court of Appeals of this state in the case of Kennedy v. The Baltimore Insurance Company. (d) With the conclusion drawn by the Supreme Court of the United States, in delivering their opinion of the extent to which corporate bodies are bound by contracts not under the corporate seal, I concur, as well as with the position taken by the Court of Appeals of this state.
In the first case, after reviewing the authorities the conclusion the court arrives at is, ‘it would seem to be a sound rule of law, that, whenever a corporation is acting within the scope of the legitimate purposes of its institution, all parol contracts, made by its authorized agents, are express promises of the corporation; and all duties imposed on them by law, and all benefits conferred at their request raise implied promises, for the enforcement of which an action may well lie.’ In the opinion of the Court of Appeals it is laid down; ‘the position is not to be controverted that, generally, a corporate body cannot act, but by its seal; but this position cannot be extended so far as to prevent their liability from the nature of the institution ; or for acts done necessarily and incidentally arising from an authority delegated by such body to their agent legally appointed.’
In the case before the Supreme Court of the United States, the plaintiff’s claim arose for work done on the banking-house itself, in virtue of an engagement made by the plaintiff with an acknowledged duly authorized committee of the corporation. The work done was necessary for carrying on the affairs of the body politic; and the work having been done, the demand of the plaintiff against the Bank, thus founded, was sustained. The cause before the Supreme Court of Maryland, was to recover money received by the agent of the corporation, in the ordinary and usual course of his agency; which money was adjudged to be due to the plaintiff. The agent was duly authorized, and acting in the ordinary course of his business. How different are these causes from the one now under consideration!
At the time when the judgment in this case was entered the bill alleges, that the manufactories were carried on by the company yielding such great profits, that the debt of Robert and John Oliver, supposing it to be really due, must have been satisfied before the time would have arrived for rendering judgment in the regular *612 course of law. To this allegation in the hill no answer is given by the defendants; their answer is silent on the subject. In the answer of the defendants it is stated, that on the 20th of February, 1822, seventeen thousand dollars were due on account of loans to the company at different periods. When the loans commenced, and the amount of each, as well as the time of each advance, is not disclosed, either by the answer, or by any other part of the transaction. At the time when they begun the situation of the company was so deplorable, that but for them, the answer alleges, an entire stop must have been put to the proceedings, to the great loss and injury of all concerned. Yet take the answer and bill together, when the situation of the company was so flourishing as to enable it, in the short space of time a suit would have occupied, to discharge a debt of $17,000, an immediate and instantaneous determination is to put a stop to the works; at least so far as the interests of the complainants in them extended.
Admitting the facts to be as set forth in the answer, that the stockholders, at a time of embarrassment and difficulty, authorized Caton to borrow money to carry on the works; can it follow, from that authority, that he had a right to such an extent to bring on ruin and destruction ? In obtaining those loans, was Richard Caton ading, to use the language of the Supreme Court of the United States, within the scope of the legitimate purposes of the institution ? If he was, then the parol contract made by him must amount to an express promise of the corporation, and lay a foundation for an action. But although he was the agent, if he went beyond the scope of his authority, although a loss may be sustained by those who confided in him, his engagements are not, either express or implied promises on the part of the corporation, and they present no foundation for maintaining an action. .But, it is not my province to decide the question of law, whether the plaintiffs could have obtained judgment at law, if the claim had been resisted, and the attention of the court called to the subject. I, therefore, proceed to the second question.
Is the authority given such as to justify the entering of the judgment ?
In examining this point, I have to disclaim all authority to interfere with the judgments of a court of law; except on equitable principles; where the court directs a judgment, it is not my province to say they were correct, or that they erred. The case under consideration is not of that character. An authority to appear *613 to a suit against a corporation can only be communicated, by the corporate seal, is a proposition not to be controverted. The authority under which the appearance is entered need not be made a part of the record to sustain the judgment. In favour of the judgment, the court will presume the authority to appear "was complete. These principles are recognized by the Court of Appeals in the ease of McMechen v. The Mayor, &c. of Baltimore, (e) But the court cannot presume against the fact; and, if the authority given did not justify the appearance and judgment, the judgment cannot be sustained. If the process of the court of law to enforce the payment of such a judgment, cannot be restrained by this tribunal, the party is remediless. For, if the property taken in virtue of an execution founded on such a judgment is sold; except it was purchased by the plaintiff in the cause, the right of the defendant to the property is gone by the sale, notwithstanding the judgment should be reversed.
There are two objections to the judgment under consideration, each of which appear fatal. First, the authority under which the appearance was entered does appear, and the corporate seal is not annexed. Second, Richard Caton describes himself, not as the president of The Cape Sable Company, the corporate name, but as ‘Presd’t of the A. and Copp’s Co. of Cape Sable,’ a name, not only in words, but in substance, essentially different. By the act of incorporation, the company, with the consent of three-fourths of the stockholders holding three-fourths of the shares, may engage in other manufactures besides alum and copperas.
To recur again to the merits of the case. The money, the answers allege, was loaned in consequence of Caton’s pledging, or agreeing to pledge the funds. The answers state he -was duly authorized. But how he was authorized; in what manner the authority was given, is not communicated.
But, it has been contended in the argument on behalf of the defendants, that as it is stated by the answer, that Caton was authorized, that, that is sufficient. If, as it was said, it was necessary for three-fourths of the stockholders holding three-fourths of the shares to communicate the authority, then, as he could not have been authorized without such consent, their consent was given; therefore, the answer, in effect, declares such consent was obtained. If the authority could be given, with the consent of less than *614 three-fourths, then, in stating the authority was given, the answer, in substance, does not undertake to allege, that the consent of the three-fourths was obtained. That is, in other words, the defendants would not, or could not state how the authority was given.
The act of incorporation is explicit, that the property shall not he mortgaged or sold without the assent of three-fourths of the •stockholders holding three-fourths of the stock. The complainants assert, they did not consent, and they represent an interest larger than one-fourth. The defendants, in their answer, do not assert, that they, the complainants, ever did assent; or that they had any knowledge of the transactions between them and Catón, who undertook to pledge the funds; an undertaking beyond his power; and, which the defendants would have discovered, had they examined the charter. They were bound, in regard to their own interests, to have examined it, and having done so, and perceived the guarded manner in which the affairs of the corporation were to be conducted, and the restrictions imposed against selling ■or pledging, before they advanced their money to Catón, they •should have seen the authority under which they acted. It was useless in the extreme to guard against mortgages and sales, if the president of the corporation, at his will and pleasure, had power to go into a court of justice and confess judgment to any amount. The judgments themselves bound the property; and a sale might be effected under a fieri facias issued thereon, and of course a mortgage or pledge, and consequent sale obtained.
On the part of the defendants it is said the want of an answer by Catón should not affect their interests; the complainants, and not them, should compel him to answer. What effect Caton’s answer may have, it is impossible to say; nor must the complain» ants, from this time forward, cease to use the necessary process of the court to compel an answer; should unnecessary delay take place, an order, perhaps, different from the one about to be passed, may be made. On the whole the injunction is continued until final hearing or further order.
Robert and John Oliver, by their petition, stated, that the injunction had been issued without requiring the plaintiffs to give bond to abide the final decision on the bill, which ought to have been required before the injunction issued. They therefore prayed, that these plaintiffs might be ordered to give bond by an appointed time, or that the injunction be dissolved, See, Whereupon it was, *615 on the 10th of December, 1823, Ordered, that the plaintiffs give bond as prayed, or shew cause on the 10th of January then next; Provided, that notice be given, &c.
7th May, 1824.
Johnson, Chancellor.
On the 21st of April last, after an attentive examination of the arguments pro and con, on the motion to dissolve the injunction, which had been issued in this cause, and after a minute and particular scrutiny, and the best reflections I could bestow on the subject, the injunction was continued, for the reasons then given in detail. At the last term, and when the case stood in the same situation as at the former argument, my attention has again been called to the subject, and the cause elaborately argued, relying on the part of the defendants, that the injunction ought not to have issued without bond and security ; and that it should be dissolved, unless such bond should be given by a prescribed day.
On the part of the complainants it was insisted, that, supposing a bond to have been necessary, yet as the injunction was obtained without one, that the irregularity of issuing it was waived by the answer. I have again considered the case and see no reason to retract from the opinion pronounced on the former occasion; nor can I discover any error in granting the injunction without bond; if, in any case a bond should be dispensed with, this is one; and the decisions of my predecessors in office fully warranted the issuing of this injunction. The time, the manner, the effect, and the immediate ruinous consequences from the hasty and unwarranted judgment demanded the immediate interposition of this court; and, unless compelled to demand an injunction bond, it should he dispensed with.
In the case of Hampsen v. Edelin, (f) no bond was given to prosecute the injunction that issued. In that case, an execution was laid on a piece of land, that the complainant had purchased and obtained a bond for the conveyance of, prior to the rendition of the judgment. Also in the case of Stewart v. Yates, (g) an *616 injunction issued, without bond, to prevent land from being sold under an execution, founded on a judgment against the legal *617 holder of the estate. In those cases, as insisted on by the defendant’s counsel in this case, the injunctions were obtained by him *618 ■who was no party to the suits at law, and only went to protect particular property from the executions.
*619 It is very true, that those injunctions were intended to free particular property from the executions; and the reasons are assigned in the bills why such property should not be liable to the executions; and no one, for a moment, could doubt, but that the same grounds applicable to the whole property, real and personal, which was once completely owned by the defendant at law, would be protected, if, prior to the judgment, as applicable to the real, or prior to the fieri facias, as applicable to the personal, he had parted with the same, so as to vest the equitable interest in him, or them, who should claim the protection of a court of equity. The principle on which those injunctions issued was, that the party applying for them was the equitable owner of the property which was attempted to be sold to pay the debts of a person who, before the judgments, had bona fide parted with the property. In those cases, it was contended, that the complainants were not, at law, parties; but here, as the complainants claim in virtue of their interest in The Cape Sable Company, against whom the judgment was rendered, they were parties to that cause, and as such were not entitled to an injunction without bond.
It is manifest, from the exhibils filed with the bill, that in point of fact the complainants were ignorant of the proceedings on which the judgment was rendered; and, for the reasons disclosed in the former opinion, those proceedings did not authorize the judgment; and none would have been obtained, if opposed by those persons holding one-third of the slock. If it be conceded, that, technically speaking, at law, all composing the company when a suit is fairly brought are parties to that suit; yet, it will not follow, that a court of equity is concluded by the judgment, or precluded from examining into the real character of the transaction, and applying the equitable relief the party is entitled. If, in ordinary corporations, the whole body is represented by the head; yet, it is competent for the Legislature, in forming a new body corporate, to restrict the powers of the president, and he can ordy move within his restrictions; and, if he attempts to go beyond them, and without the power of a court of law to grant redress, it is competent for this tribunal to interpose. When the act of incorporation restricted the power to sell and dispose of the property, or mortgage the whole, or any part thereof, to the previous consent of three-fourths of the stockholders holding three-fourths of the shares, unless the act is rendered totally nugatory, so far as relates to the restriction, it must prevent the president from voluntarily going *620 into a court of law to confess a judgment, and thereby bind the property more effectually than a mortgage.
The present complainants never had an opportunity to resist the judgment; the manner it was rendered precluded them from asserting their rights, they had no more opportunity to resist the entering of the judgment than those whose equitable interests was protected by this court, from judgment at law over which they had no power or control. It cannot be supposed, that if this court can protect an equitable interest from a judgment at law, it is precluded from giving the same protection to a legal interest standing in need of the same protection. In the case cited, as determined by Chancellor Hanson, the legal interest in the land was vested in the complainant when the injunction issued; he obtained a conveyance, founded on an equitable title, subsequent to the judgment; and, of course, held the legal title in the land to which the injunction applied.
The injunction will continue until final hearing or further order. If a speedy decision on the merits is desirable, on the answer of Catón coming in, the cause may be ready for final hearing.
After which these plaintiffs, on the 10th of June, 1824, filed a third bill against The Cape Sable Company, Richard Catón, Robert Oliver, Charles Carroll of Carrollton, Robert G. Harper, George Slye, Samuel C. Love, Luke W. Barber and Thomas Barber; in which they refer to and pray to have their two former bills made parts of this. And they state, that since the judgment which had been obtained in Anne Arundel County Court, on the 9th of December, 1822, by Robert and John Oliver, John had died; that this defendant Robert Oliver, his surviving partner, on the 26th of May, 1824, by a combination with this body politic and its president Harper, and with the defendant Catón, had, with intent to defraud these plaintiffs, and in order to evade the injunction heretofore issued, caused a judgment to be confessed in Baltimore County Court against The Cape Sable Company in favour of Robert Oliver for the same demand for which the former judgment had been rendered in Anne Arundel County Court; upon which judgment, of Baltimore County Court, a writ of fieri facias was taken out, before any execution had been issued and returned nulla bona to that court, and directed to the sheriff of Anne Arundel; which was promptly levied upon all the visible property of The Cape Sable Company; which was immediately advertised for sale; that although *621 this writ of fieri facias was sent from Baltimore to Anne Arundel by consent; yet no such consent of The Cape Sable Company could give jurisdiction to a court, where none such was given but in a prescribed manner. That at the March term, in the year 1822, of the Baltimore County Court, these defendants Luke W. Barber, Thomas Barber, George Slye, and Samuel C. Love severally obtained judgments against The Cape Sable Company; upon each of which judgments writs of fieri facias were issued and returned nulla bona to the September term of that year of the same court. After which, on the 22d of January, 1823, writs of fieri facias issued on the same judgments to the sheriff of Anne Arundel; which were returned nulla bona to the April term of the same year of the court of that county. That no further or other process was issued thereon until the first day of June, 1824; when, by consent, wdthout any scire facias to revive them, wuits of fieri facias were taken out from Anne Arundel County Court on each of them, and levied upon all the property of The Cape Sable Company; which was advertised to be sold on the same day appointed for the sale under Oliver’s execution; that all four of these last mentioned judgments had been satisfied by money advanced by the defendant Carroll to the defendant Harper, who afterwards assigned them to the defendant as a security for the money so lent and advanced by him; that on the 4th of June, 1824, after the property of The Cape Sable Company had been actually taken in execution and advertised for sale, actions of debt on these same judgments wrnre docketed by consent, and judgments confessed thereon in Baltimore County Court for the use of the defendant Carroll; that although these latter judgments may be 'void; yet the property of the The Cape Sable Company, in which these plaintiffs have so large an interest, cannot be thus subjected at law to a double execution for the same debts; and that the sole object of all these proceedings has been to deprive these plaintiffs of their rights, and to exclude them from all connexion with The Cape Sable Company as legal and equitable stockholders therein. Whereupon the bill prayed for an injunction to stay the proceedings at law, &c. Which wms granted accordingly.
Richard Catón, by his answer to this bill, admitted that the proceedings at law had been had as stated; but averred, that they were all bona fide, and that there was no fraudulent intention on the part of any of the defendants, &c. The defendants Robert G. Harper and The Cape Sable Company answered to the same effect. *622 and he averred, that the judgments of Slye, Love, and the Barbers, never had been satisfied, and that they had been regularly assigned to the defendant Carroll for a valuable consideration. The defendant Robert Oliver, by his answer, states and avers, that the amount for which he had obtained judgments against The Cape Sable Company in Anne Arundel County Court was for money lent and actually applied to the use of that body politic; that the decisions of this court of the 21st of April, 1823, and the 7th of May, 1824, so vitally attacked that judgment as perfectly to nullify it; and that therefore, and with a view, in the most effectual manner, to correct and remove those great informalities which had been pointed out, and were considered as so fatal to that judgment, the suit was instituted and a judgment obtained in Baltimore County Court, on the 26th of May, 1824, for the same debt, &c. as alleged by the plaintiff. This defendant denies all fraud, &c. The defendant Carroll, in his answrnr states, that he was applied to by the defendant Harper and others for the loan of money to relieve the .enbarrassments of The Cape Sable Company; and that he, after .■some negotiation, agreed to lend his money, and took as a security for the money so lent to that body politic an assignment of the judgments of Slye, Love, and the Barbers, which were then and yet remain in full force, and wholly unsatisfied; and that he caused writs offieri facias to be issued on them, as stated in the bill; that as to the judgments which appear to have been confessed in actions ■of debt on .the judgments originally of Slye, Love, and the Barbers, in Baltimore County Court on the 4th of June, 1824, they were, ■obtained in consequence of a misundertanding of his attorney, and because he was ignorant, that executions had previously issued to Anne Arundel County; but those judgments will be vacated, or otherwise disposed of so as to keep them harmless, in such manner as the Baltimore County Court may, at its next term, direct. This defendant alleges, that he is ignorant of the other matters stated in the bill; and he denies all fraud, &c.
Upon these answers the case was brought before the court on a motion to dissolve the injunction.
10th November, 1824.
Bland, Chancellor.
The motion to dissolve the injunction standing ready for hearing, and the solicitors of the parties having been fully heard, the proceedings were read and considered.
This case has been gathered into the shape in which it is now presented to the court in three separate parcels, commenced at *623 three distinct periods. The first is that belonging to the bill filed on the 6th of August, 1822; the second is that of the bill of the 4th of January, 1823; and the last is that which has been accumulated under the bill introduced to the court on the 10th of June, 1824. On each an injunction has been awarded; and all have been combined, or in a manner consolidated by each of the latter bills, invoking the prior bills and proceedings into itself. The object of them all is to establish and protect the interest, which Ridout and Jubere claim, as trustees, for the use of John Gibson’s children, in the stock of The Cape Sable Company. The present motion is to obtain a dissolution of the injunction which has been granted on the last of these bills.
Upon a careful consideration of all the facts and circumstances which gave rise to the equity upon which this injunction was granted, it appears, that the answers of the defendants, who make the motion, have not so denied them as to displace any material part of that foundation of fact upon which this injunction rests, (h) But it is a general rule, that where there are two or more defendants, a motion to dissolve cannot be heard until the answers of all of them come in. (i) The Barbers, Slye, and Ljove, have neither of them yet answered ; and it is highly probable, that they may disclose facts of the greatest importance upon a motion of this kind.
It is therefore Ordered, that the injunction heretofore issued in this case, be continued until the final hearing or further order,
After which the defendants Thomas Barber, George Slye, Samuel C. Love, and Luke Barber, put in their answers, in which they state, that their several judgments had been assigned, for a valuable consideration, before they were satisfied, to the defendant Carroll; and they denied all fraud, &c. It wTas agreed, that the answer filed by Richard Colon on the 23d of June, 1824, to the bill filed on the 10th of June, 1824, should be received as his answer to the bill filed on the 4th of January, 1823. And also, that the answer of The Cape Sable Company, filed on the 24th of June, 1824, to the bill filed on the 10th of June, 1824, should be received as their answer to the bill filed on the 4th of January, 1823. To all these answers the plaintiffs put in a general replication, and commissions were issued and testimony taken. The Chancellor, *624 with a reservation of his determination of the matters of the two last bills, passed the following decree on the bill filed on the sixth of August, 1822, and the answers thereto.
22d May, 1827.
Bland, Chancellor.
Decreed, that the parties account with each other concerning the matters and transactions in the proceedings mentioned: that the auditor state the account relative thereto on the evidence in the case, and such other evidence as the parties may produce to him on notice, as usual in such cases. The account to be returned to this court for further order, and subject to the exceptions of the parties.
The auditor made and filed on the 8th of March, 1828, a report, dated on the 29th of February, 1828, in which he says, that he had examined the proceedings and the voluminous documents produced on the part of The Cape Sable Company; and that it fully appears, that the necessary expenditures on account of the company have greatly exceeded the moneys received for stock, materials sold, &c.; and therefore, that there is nothing due for dividends or profits on the shares claimed by the complainants. The accompanying statements shew, that the company is now in debt to the amount of $34,294 91, exclusive of interest. Those statements exhibit a result different in some degree from that of the accounts heretofore prepared and filed on behalf of the defendants. But this difference is to be attributed chiefly to the different forms in which the accounts are prepared. There may be some differences in the details ; but if such exist, they are of trifling amount, and cannot affect the substantial result. The auditor has considered it unnecessary to institute a minute comparison between the two statements; because, after deducting all questionable charges, if such exist, the company would remain in debt to an amount greatly exceeding the value of all their property. The bill contains very grave charges against the defendants; impeaching their motives, and mode of managing the affairs, and in particular, the pecuniary concerns of the company. And the auditor has, in his character of counsel for the complainants, frequently insisted upon those charges. It is due to the defendants and himself to declare, that an investigation of the accounts has satisfied him, that all the moneys received for the use of the company have been promptly and properly applied, by its agents, to the uses of the company; and that those agents have been frequently in advance to a large *625 amount; and from time to time incurred heavy responsibilities in order to carry on the works.
Annexed to this report there was an agreement, signed by the solicitors of the parties, in which it is said, that it is agreed, that the injunctions heretofore issued in the cases of the same plaintiffs against Robert Oliver and others, be dissolved, and all the bills be dismissed. The question of costs alone is submitted to the Chancellor without argument.
8th March, 1828.
Bland, Chancellor.
The said case, the bill filed on the 6th of August, 1822, together with the two others mentioned in the agreement of the parties this day filed, having been submitted according to the terms of the said agreement; and it appearing, that the complainants had in fact no just cause for filing the said bills.
It is thereupon Decreed, that the injunctions heretofore awarded in the said several cases, be and the same are hereby dissolved. And it is further Decreed,, that the several bills of complaint of the said complainants, be and they are hereby dismissed with costs, to be taxed by the register.
Soon after which the plaintiffs, by their petition, stated, that their three bills and cases, though not properly consolidated, relate to the same subject matter, are intimately connected, and have been prosecuted together. They were heard together; and the first case referred to the auditor with directions to state an account, and the decision of the others reserved. That the agreement, under which the decree of the 8th instant was passed, was hastily and inadvertently entered into by one of the solicitors of the plaintiffs ; that, in consequence of that decree, executions may shortly be issued against the property of The Cape Sable Company, in which these plaintiffs are concerned, and their interests sacrificed. Whereupon they prayed, that those cases might be reinstated, &c.
14th March, 1828.
Bland, Chancellor.
On consideration of the foregoing petition, and the representation of the solicitors; it is Ordered,, that the said decree of the eighth instant be, and the same is hereby suspended; and the said injunctions heretofore granted in the said cases, are reinstated until further order. Provided, that no cause be shewn to the contrary on the fourth day of April next, or any earlier day, that may be agreed on between the solicitors of the parties. Jlnd provided, that a copy of this order, together with a copy of the foregoing petition, be served on the *626 said defendants or their solicitors, on or before the twenty-first day of the present month.
Afterwards the parties to these three combined cases ; that is to say, the bill filed on the 6th of August, 1822; the bill filed on the 4th of January, 1823; and that filed on the 10th of June, 1824, submitted them all together on the following agreement: ‘It is agreed in the above cases, that a decree shall be passed for the sale of the property of The Cape Sable Company, mentioned in the proceedings in said cases, by trustees to be appointed in the usual form and terms; and that Samuel Moale and Charles F. Mayer be the trustees for making said sale. And that the proceeds of said sale shall be distributed by the court according to the rights of the parties. And that the court pass an order notifying creditors to exhibit their claims against The Cape Sable Company in Chancery in order to such satisfaction as the court may determine them to be entitled to out of the said proceeds. It is provided, however, that if the said Robert Oliver shall become the purchaser of the said property, or of any part of it, the amount of his and Charles Carroll’s alleged judgments against The Cape Sable Company may be retained in his hands, without interest, until a final distribution of the proceeds of sale aforesaid, shall be ordered by this court;' the said Robert Oliver giving bond and security, however, for the amounts retained by him as aforesaid; and interest ceasing from the time of said retention on the claims that said Oliver and Carroll respectively may have against The Cape Sable Company. It is further agreed, that the terms of said sale shall be, that five thousand dollars, part of the purchase money, shall be paid in ninety days; and the residue in equal instalments in one, two, three, four, and five years, from the day of sale, with interest from said day. For all which payments promissory notes shall be given with surety, to be approved by the trustees. It is further agreed, that the sale shall take place on or before the first of July, 1828; and that six weeks notice of such sale shall be given. It is further agreed, that each of the said parties shall have the right to appeal from any order or decree of the Chancellor respecting the distribution of the proceeds.’
5th April, 1828.
Bland, Chancellor.
The said cases standing ready for hearing, and being submitted, it is, with the assent of the parties in writing, filed. Decreed, that the property of The Cape Sable Company, mentioned in the proceedings, be sold; and *627 that Samuel Moale and Charles F. Mayer he appointed trustees to make the sale, &c. And, in pursuance of the said agreement, it is further Decreed, that if the said Robert Oliver shall become the purchaser, he may retain, &c. And the trustees at the time of advertising the said sale, shall also give notice to the creditors of The Cape Sable Company, to exhibit their claims, with the vouchers thereof, in the Chancery Office, within six months from the day of sale.
It appears, that the plaintiff Addison Ridout had died some time previous to the passing of this decree; but as his interest survived to the parties before the court, the case proceeded in the name of Joseph Jubere. But James Jubert, the other trustee, one of the plaintiffs by whom the suit had been hitherto prosecuted by the name of Joseph Jubere, by his petition, now stated, that he never, until lately, heard of his having been constituted a trustee, or of the suit having been instituted in his name; that he had never at any time, or in any way, consented to act as trustee, or to the bringing, or prosecuting of this suit. Whereupon he prayed to be discharged, &c. The solicitors of the plaintiffs assented to the prayer of this petition, and recommended Augustus E. Addison to také his place.
29th June, 1828.
Bland, Chancellor.
On consideration of the foregoing petition and the consent of the complainant’s solicitor this day submitted; it is Ordered, that the said bill of complaint, as to the said James Jubert, who, as is alleged, had instituted the said suit by the name of Joseph Jubere, be and the same is hereby dismissed with costs. And it is further Ordered, that the said Augustus E. Addison be and he is hereby appointed trustee in the place and stead of the said James Jubert, who sued by the name of Joseph Jubere, and that the said Augustus E. Addison be substituted for, and be considered as standing in the place of the said Jubere, as trustee in the said bill of complaint and all the proceedings of the said suit.
The trustees Moale and Mayer reported, that they had, on the 30th of June, 1828, sold the whole of the real and personal estate of The Cape Sable Company in pursuance of the decree; and that Robert Oliver was the purchaser thereof for the sum of $24,000, with a reservation of the claim of Philip G. Lechleitner of a lease and the value of certain fixtures to be allowed to him, and de *628 ducted from the amount of sales. The real estate is described by these trustees in their report, as consisting of several tracts and parts of tracts of land as therein named, containing about one thousand and ten acres, with a right of mines and minerals in about eight hundred and seventy-six acres of other lands, all lying in Anne Arundel county; and the personal estate they describe as consisting of slaves, horses, carts, wagons, implements used in the manufactories, &c. But they do not say, or in any manner intimate, that the real estate was sold, or even offered for sale separately from the personalty; nor do they furnish any means whereby the separate value of the real and of the personal estate may be ascertained, or how much of the purchase money was given for the one or the other. These trustees also report, that they had given notice, as directed, to the creditors of The Cape Sable Company, to bring into the Chancery Office the. vouchers of their claims, within six months from the day of sale. This sale was finally ratified on the 23d of September, 1828.
On the 6th of October, 1828, Philip G. Lechleitner, for himself and in behalf of and to the use of J. J. Vanderkemp, executor of Paul Busti, deceased, filed his petition and claim, in which he states, that he was for a number of years employed by The Cape Sable Company as agent and superintendent of its manufactories and concerns; that in the course of his agency he had, as appeared by his account, which he was ready and would be able to verify, large sums of money due to him, amounting, on the 10th of August, 1824, to the sum of $27,042 45; which, with interest on the several items, was still due; that he had assigned this claim against The Cape Sable Company to the late Paul Busti to secure him for the amount which he, Lechleitner, owed him, Busti. Whereupon he prayed, that his claim might be adjusted and allowed accordingly, &c.
Among the vouchers produced and admitted in evidence, in relation to this claim of Philip G. Lechleitner, is an agreement under seal, made and entered into on the 25th of September, 1813, by Richard Catón, John Gibson, Robert G. Harper and Robert Patterson of the first part, and Philip G. Lechleitner and Gerard Troost on the second part, for the establishment and carrying on of works for making copperas and alum, or either of them, on lands in Anne Arundel county, lately conveyed by the said John Gibson to Charles Carroll of Carrollton, in trust for the use of the said John Gibson,. Rickard Catón and others. The partnership *629 formed under this agreement was to continue for ten years from the' date thereof; and the mode in which the business of the concern was to be conducted ; the capital to be furnished by the parties of' the first and second part; and the terms and proportions in which the profits were to be divided between them, are all particularly specified in the contract itself.
On the 22d of October, 1828, William O’Hara filed his petition, in which he stated, that during the term of his sheriffalty of Anne Arundel county, four writs of fieri facias from Anne Arundel County Court against The Cape Sable Company, one at the suit of Samuel C. Love, another at the suit of George Slye, a third at the suit of Luke W. Barber, and a fourth at the suit of Thomas Barber, vi’ith another writ of fieri facias from Baltimore County Court against The Cape Sable Company, at the suit of Robert Oliver, surviving partner of John Oliver, were delivered to him to be executed ; that he levied them accordingly, and advertised the property of The Cape Sable Company so taken for sale; but was restrained from proceeding further by the injunction issued in this case; that afterwards, under the decree of this court, all the property of The Cape Sable Company was sold ; and that his poundage fees have not yet been paid. Whereupon he prayed that they might be paid out of the proceeds of sale, &e.
5th November, 1828.
Bland, Chancellor.
Ordered, that the matter of the foregoing petition stand for hearing on the fifth day of December next; provided that a copy of this order, together with a copy of the said petition, be served on the respective parties in this suit, or their solicitors, on or before the seventeenth day of the present month.
Copies having been served as required by this order, the matter was at the time appointed for the hearing brought before the court.
15th December, 1828.
Bland, Chancellor.
The petition of William O’Hara standing ready for hearing, and his solicitor having been heard, and no one appearing for any of the parties, although notice had been given as required, the proceedings were read and considered.
It appears that the petitioner, as sheriff of Anne Arundel county, executed five writs of fieri facias against The Cape Sable Company. It is not shewn when any of these writs came to his hands. From his return it appears, that they were all laid together on certain real and personal property as per schedule; but on what day, is not said. *630 After these executions had been thus levied he was prevented from proceeding to make sale, by an injunction from this court obtained at the instance of these complainants; who represented and claimed the interest of one of the corporators of The Cape Sable Company, against all the plaintiffs and defendants in those writs of fieri facias. After which, and while the injunction was in full force, by a decree of this court, passed with the consent of all the parties to the suit, all the property of The Cape Sable Company, including the whole of that on which the executions had been levied, was directed to be sold, and the proceeds brought in to be distributed among the creditors and parties in proportion to their respective claims ; and it has been sold accordingly.
The object of this petition is to recover the poundage fees to which the petitioner alleges he became entitled upon levying those executions.
It is perfectly clear, that a sheriff’s right to poundage fees is a claim of a legal, not an equitable character. That he has a complete remedy at law, either by action, or by selling for the amount, by virtue of the execution that has been levied is certain, and admitted on all hands. The only doubt upon the subject, at common law, is, whether the plaintiff or the defendant is liable to him for them, in all or in what cases. But this sheriff has thought proper to present his claim for poundage fees to this court, in this case. It is, therefore, not only necessary, that he should establish his legal claim against one or other or all of these parties; but, that he should also shew why he should be indulged in bringing that legal claim here; and upon what ground or equitable bearing it is, that this court can allow itself to entertain jurisdiction of his case.
According to the common law, sheriffs were entitled to no fees whatever for executing a fieri facias or any other process. (j) But, in England, by an act of Parliament, passed in the year 1444, not applied here, some fees were allowed; (k) and by the statutes passed in the year 1587 and 1716, not adopted here, they were allowed a certain compensation for their trouble, graduated according to the amount directed to be raised by the execution, called poundages fees from the manner in which they are estimated; being so much per pound for the first hundred pounds; and so much less for every pound above that. (l) These statutes do not extend *631 to real executions, but only to executions in personal actions; and, therefore, the sheriff is, in England, allowed no poundage fees for executing a habere facias possessionem, (m) Nor do they embrace any case where money is raised by process of attachment for contempt, upon which no poundage fees can be charged. (n)
It would seem, that the sheriff’s right to poundage fees accrues and is complete in all cases immediately that the writ is regularly executed ; although no sale should be made; or the execution, because of some antecedent error should be quashed, or the suit should afterwards be compromised, (o) In strictness the sheriff should make a return of the whole sum produced by the sale, when the court will order it to be paid over, deducting the poundage; but where the sheriff has received the poundage fees to which he was legally entitled, he will be allowed to retain them. (p)
It has been urged, that the sheriff has a lien upon the property taken in execution, for his poundage fees. But it is no where directly said, that he has any such lien upon the property taken, either as against the plaintiff or the defendant; or that he has a right to hold it in any way until his fees are paid. Yet the allowance of such a lien, so far as it does not conflict with the rights of others, or that superintending control necessary to the due administration of justice would seem to be entirely reasonable, and sustainable upon principles analogous to those on which tradesmen and officers are allowed to have a lien upon property in their possession to secure the payment of their compensation and fees. But such a common law lien can only exist as an associate with possession; it begins and ends with possession. (q)
In this case the petitioner having been lawfully and completely divested of the possession of all the property he had taken in execution, he certainly can have no lien, according to the common law, upon it, or its proceeds, which the court is now about to distribute. And there is not the slightest ground to maintain, that a sheriff has a general lien on the property taken by him in execution, like the lien of the state upon the property of its debtors, or a plaintiff’s judicial lien, as on a judgment at law, or a lien according to the civil law which follows the property on which it has *632 once fastened, through every change, and into all other hands. The petitioner, therefore, cannot sustain his pretensions upon any foundation of this kind. (r)
In the case under consideration, it is necessary to ascertain whether the plaintiffs or the defendants in these executions are liable to the sheriff for his poundage fees; and the principles upon which that liability rests.
This court has, in many instances, where it has money in its hands which it is about to pay over to a party who is liable no further than to the amount of such assets; or who is not a resident of the state, and within the reach of common law process, allowed a creditor of such a parly to come in and obtain payment of his merely legal claim out of the assets or money of his debtor in this court. It seemed to be admitted, and indeed I do not see how it could be denied, that if the plaintiffs in those executions only were liable for these poundage fees, that there could.not, from any thing alleged or shewn by the petitioner, be the slightest pretext for this court to entertain jurisdiction of his case, as he has against them an ample remedy at law. Because it is not shewn, that these proceeds are specifically bound for those fees, or that they are assets in respect of which those plaintiffs are chargeable; or that those plaintiffs are insolvent, or non-residents, and beyond the reach of ordinary common law process. There is, therefore, nothing in the petitioner’s case which can entitle him to relief upon any such grounds as against the parties to this suit who are the plaintiffs in the executions.
But there are other kinds of executions which go against the person, or do not direct the property of the defendant to be taken and converted into money, on obeying which the sheriff becomes entitled to poundage fees. On taking the defendant into custody under a capias ad satisfaciendum, the sheriff becomes entitled to poundage fees on the whole amount, (s) And so, too, on executing a levari facias, an elegit, or a liberate, by virtue of which the property is not sold, but specifically delivered to the plaintiff in satisfaction of his claim, (t) In all these cases, as well as in all those where the execution, after it has been regularly levied, but, before a sale, has been countermanded; or has been quashed on account of some previous error in the proceedings; or the suit has *633 been compromised, it has been made a question whether the plaintiff or the defendant was liable to the sheriff for his poundage fees.
The English statute which allows these fees says nothing which indicates an intention of the Legislature to impose a liability for them upon either the plaintiff or the defendant. It might be supposed, that in all cases where the amount of the plaintiff’s claim •was to be raised by a sale of the defendant’s property, that the poundage fees should be included; and, consequently, that the defendant should be liable for them. And, that in all other cases where the plaintiff obtained satisfaction by. having the defendant’s body taken into custody; or by obtaining a delivery of his property, as no money passed through the sheriff’s hands, from which he might deduct and retain his fees, the plaintiff should be held liable for them. But no such distinction has ever been made or recognized in any of the adjudged cases. On the contrary, it is said that in actions on simple contract, and judgments for a debt certain, the expenses of levying must be paid by the plaintiff, and not by the defendant. But if the judgment be for a penalty, the plaintiff has a right to receive the whole of his debt, independent of the expenses of the execution; and, in those cases, the defendant is liable for the whole amount of the poundage fees. (u)
It would seem, that in England sheriffs had taken advantage of the general phraseology of this statute of 1587, and charged poundage fees for the whole amount specified in the writ, in all cases, although there was, in truth, no more than a small balance due. To remedy this grievance, another statute was passed in the year 1716, requiring the sum really due in all cases to be endorsed on the back of the writ, on which amount, and no more, poundage fees were to be allowed. (w)
It appears, that one of the causes which accelerated and aggravated the war of independence in this state was an angry controversy which had arisen between the last Proprietary governors and the people as to the right to fix and regulate officers’ fees ; (x) in consequence of which the second General Assembly of the Republic, passed an act, even before the judicial department had been fully organized, to regulate such fees; in which, apparently in accordance with an English principle, (y) it declared, ‘that officers’ *634 fees can be rated, regulated and established by act of Assembly-only.’ (z) This law was re-enacted; (a) and with some slight modifications again re-enacted into that law, the greater part of which still remains, (b) Two of the sections of the last of these acts are merely corresponding provisions of the early legislative enactments of the Republic upon the subject of poundage fees. The Provincial act of Assembly allowed fees to sheriffs upon executions similar to poundage fees; (c) but it is perfectly evident., from the language of the enactments of the Republic, that their provisions were taken from the English statutes of 1587 and 1716. And it is also remarkable, that all the acts of Assembly of Mary - land, like the English statutes, have left it uncertain whether, in, general, the plaintiff or the defendant was to be held liable for the poundage fees. A late act of Assembly has made some alterations as to the amount of these fees in suits at common law; but has not cleared away the obscurity of the previous laws upon the subject, (d)
It is certain, that upon the acts of Assembly a sheriff may maintain an action at law to recover his poundage fees. And it has been held, that the act of Assembly shews, that the defendant is liable for the poundage fees; that there is no instance of the plaintiff’s receiving the poundage fees from the defendant; and that upon a fieri facias if goods are taken; and the debt is compromised, the sheriff can sell to the amount of the poundage fees ; or that although he cannot detain the defendant in custody after he has paid the debt and costs; yet he may compel him to pay the poundage fees in the same manner he can any other fees, (e) It would seem, from what has been said in this case, to have been held to be a general rule, that the defendant was in all cases liable; yet, in a previous case, the defendant’s liability appears to have been rested, in some degree, upon his promise to pay. (f) And in another case it appears, that the sheriff brought an action of assumpsit against the plaintiff, who had sued out an attachment, *635 for poundage fees which he claimed for executing the writ upon the lands and tenements of the non-resident defendant, as fees allowed hy the áets of Assembly, (g) Upon which it was held, that they must be paid by the person who issues the attachment. (h)
The result of these adjudications I take to be, that in all cases where the sheriff has taken the property of the defendant, or his person is within reach of the ordinary modes of proceeding, the defendant shall be held liable; but w’here he is beyond the reach of the process of the law, the plaintiff, who proceeds against him as an absentee or non-resident, shall be liable for the poundage fees.
On applying these principles to the case under consideration, it clearly follows, that this defendant The Cape Sable Company alone is liable at law to this sheriff for his poundage fees ; the complete legal right to which, to the full amount of the debt actually due, accrued by the levy he made, as specified by his return of those writs. And it is equally evident, that but for the interposition of the injunction he might have sold the property of the company, at least, to the amount of his fees ; or have enforced the payment of them in like manner as other fees. It was therefore the injunction of this court, which put a stop to all further proceedings at law, that prevented this sheriff from recovering his poundage fees by means of the executions he had levied. And it is by means of the decree of this court, under which all the property of this body politic has been sold ; and which has reduced it to the condition of a mere pennyless entity, utterly destitute of pecuniary ability to pay any claim, that this petitioner seems now to stand upon the eve of being deprived of the means of recovering his fees, in any manner whatever, unless by the aid of this court.
At common law a plaintiff might be prevented from obtaining the benefit of his judgment by a writ of error. Formerly there was always sued out along with a writ of error, a writ of supersedeas, which directed, ‘that if the judgment be not executed before the writ of supersedeas, the sheriff is to stay from executing any process of execution until the wTrit of error is determined.’ From which it appears, that if the execution had been begun before the supersedeas was delivered, the sheriff ought to proceed to complete *636 it so far as he had gone; but not any further. That is, if he had taken the defendant into custody under a capias ad satisfaciendum he might detain him; or if he had levied a fieri facias he might sell the goods and bring the money into court to abide the event of the writ of error. Afterwards, when the writ of supersedeas was no longer used, and the writ of error itself was held to operate as a supersedeas, the same rule was observed, (i) And it has been since applied, under our acts of Assembly, to the time of giving bond to prosecute the writ of error with effect, which alone operates here as a supersedeas. Whence it would seem necessarily to follow, that although a plaintiff might be prevented by a supersedeas from having the product of an execution upon his judgment which had been actually levied, yet the sheriff might be allowed to sell, to bring the money into court, and to retain the poundage fees.
As a general rule an injunction commands nothing to be done, or to be undone; its intention and operation is to preserve all things in the condition it finds them until the equity can be heard and determined, (j) In these respects the analogous principles relative to a stay of further proceedings, produced by the supersedeas of a writ of error, appear to have been applied to an injunction to slay proceedings at law. If the defendant had been taken into custody under a capias ad satisfaciendum before the injunction was served upon the sheriff, the injunction would not, in itself, operate as a discharge; but the sheriff might still detain him. Yet, in such cases, the defendant, by the special interposition of *637 the Court of Chancery, might be discharged. In doing which, however, great care would be taken to make him as liable as if he had been kept in execution for the debt; and particularly, that he should be responsible for the sheriff’s poundage fees, and for all other incidental expenses. (k)
The act of Assembly has altered the law upon this subject so far as, that upon the service of the injunction the sheriff must discharge a defendant held in custody under a capias ad satisfaciendum. (l) But it is perfectly manifest from the language of this act, that it was not the intention of the Legislature thereby to impair the rights of the sheriff; or to lessen the liability of the defendant in any other respect whatever; and, consequently, as we have seen, although the defendant was discharged from custody, yet the sheriff might recover his poundage fees in like manner as any other fees. (m)
Upon the same principles it was the established law, that if a fieri facias had been levied upon the property of the defendant before the sheriff was notified of the injunction, he could not proceed to sell; but must return the fact of his having been so stayed, and hold the property taken until the injunction was dissolved, or otherwise disposed of. But after the dissolution of the injunction the sheriff might proceed to sell, or he might be commanded to do so by a venditioni exponas. (n)
A partial alteration of the law upon this subject has been made by an act of Assembly which declares, that, where personal property has been taken in execution, the sheriff, on being served with ail injunction, shall deliver it back to the party from whom it *638 was taken, (o) This provision is expressly confined to personal property; the law remains unaltered as to any real estate which may be taken in execution; and, consequently, after the dissolution of an injunction, which had prevented a sale of lands, the proper mode is for the sheriff to proceed to sell under the original levy, which remains unbroken; or to have him commanded to make a sale of it by a venditioni exponas, (p) I cannot conceive, that this act of Assembly which directs the personal property to be re-delivered, will admit of being so construed as in any manner to impair the sheriff’s right to his poundage fees. Its avowed object was to relieve him from his responsibility as the keeper of perishable property; and to benefit the defendant by delivering it back to him. In other respects the sheriff’s right to his fees remains unaffected.
From these views of the subject I feel satisfied, that the sheriff’s right to poundage fees has not been, in any manner, shaken by the mere interposition of the injunction. According to the ancient course the court would not have discharged either the person or the property of the defendant from the custody of the sheriff under the execution, but upon the express condition, that his poundage fees should be paid or secured; (q) and the alterations made by the acts of Assembly go no further than to prevent the sheriff from holding the person or selling the personalty taken in execution as a means of obtaining payment of his fees.
But this suit was instituted, and the injunction obtained by a corporator of The Cape Sable Company, as complainant against that body politic, and the plaintiffs in the executions as defendants; and they have, by a special agreement, consented to a decree directing the whole of the property of this corporation to be sold. It is therefore this decree which has thus left this sheriff in the possession of a complete legal right without any means whatever at law of having it satisfied. If the injunction had been dissolved the sheriff might, as we have seen, have proceeded, under the levy he had made upon the land of this company, to make sale of it to satisfy his poundage fees; but the decree has deprived him of the right to do so.
The plaintiffs in the executions cannot be permitted to consent to a decree, or in any manner to produce a sale of the defendant’s *639 property under an authority different from that of the executions they had caused to be issued, and levied by the sheriff, so as to deprive him of his poundage fees. Such a course of proceeding by those plaintiffs, to the prejudice of the sheriff, would be a fraud upon him, which I find no ground to impute to them from any of their manifested intentions. Their consent to the decree for a sale must, therefore, be considered as an implied admission, that the sheriff’s right should not be affected by it; and that his fees should be first satisfied out of the proceeds of the sale made under the decree.
Then as to The Cape Sable Company, and its several corpora-tors, who were clearly liable in their politic capacity, they could not surely be allowed in any way to cast off their liability and leave this sheriff’s claim unsatisfied. To turn this sheriff over to his action at law against this company, grounded on their legal liability, would be to leave him without the least redress; since it is shewn, that he could not even compel them to answer his demand; as they have no property which could be taken under a distringas to enforce an answer, (r) For it would seem, a corporation divested of the means of answering the ends of its institution is thereby dissolved, (s)
I am therefore of opinion, that the claim of this petitioner is a just and legal one; and that upon the equity arising out of the peculiar circumstances of this case, it is indispensably necessary, that this court should take cognizance of it and grant to the petitioner the relief he asks; and that his claim should be paid in preference to the plaintiffs in the executions, and The Cape Sable Company, or any of its corporators.
According to the strict principles of the feudal system, the feudatory was not allowed to alien any land held by him of his superior; nor could land so held be sold under an execution for the payment of debts, lest such a sale might be resorted to as an indirect mode of alienation. But apart from those principles of feudal law; land, according to all law, at all times, and every where, appears to have been considered, in this respect, as a species of property deserving the most deliberate regard. Not being capable, like mere perishable moveables, of being safely, and with *640 out disadvantage, passed at every season, and immediately from hand to hand; the alienation and transfer of land from one to another has been every where required to be made and authenticated with a higher degree of solemnity than mere personal estate. And as agriculture has always been regarded as the first of pursuits, and of the highest importance to the commonwealth; (t) no compulsory alienation has been allowed to be made, in any case, to the prejudice of husbandry, or so as to endanger the loss of any then growing crop. (u) For these reasons it seems to have been every where regarded as a general rule, that land should not be liable to be taken in execution and sold, where there was a sufficiency of moveables to be found for the satisfaction of the debt. (w) And, following out the reason of this general rule, it has always *641 been tbe course of this court, in all cases, where a sale of real estate has been made under its order or decree, to have a delivery of the possession so made as to insure the safety of the then growing crops. (x)
The statute of 1732, which subjects land to be taken in execution and sold for the payment of debts, makes no distinction between real and personal estate. (y) And I know of no case, in this state, in which it has been held or even intimated, that in executing a writ of fieri facias, the plaintiff or the sheriff was under any, the least obligation to endeavour to obtain satisfaction first out of the personal estate of the defendant, (z) Yet as the ancient common law did make such a distinction; and as the personal estate is, in many respects, considered by our law as the primary and natural fund for the payment of debts ; (a) the personal estate should, in this instance, have been first applied. And, therefore, the sheriff here must be held to be entitled to poundage fees on the personalty, so far as it would have gone, according to its appraised value, towards the satisfaction of the sums really due; and for the residue to poundage fees upon the realty. (b)
Whereupon it is Ordered, that the petitioner William O’Hara be and he is hereby allowed poundage fees as prayed ; that is to say, the amount of such fees to be estimated according to law, on the personal property taken in execution by’ him as aforesaid, so far as the same was adequate, according to its appraised value, to have satisfied the amount really due upon the said executions, and required to be made by them; and upon the residue thereof, which must have been satisfied out of the real estate so taken in execution, according to law as where lands are taken in execution and sold, (c) And it is further Ordered, that the said poundage fees are hereby allowed out of the proceeds of the sales of the property of The Cape Sable Company in preference to the claims of the plaintiffs in the said executions, and of The Cape Sable Company and its corporators. And the auditor is hereby directed to state the claim accordingly.
*642 On the 20th of April, 1829, Philip G. Lechleitner, as a claimant against the proceeds of sale in this case, by his petition, not on oath, stated, that the sheriff O’Hara had, by a special contract, agreed to accept as a compensation for his services a sum about two-thirds less than his legal poundage fees. Whereupon he prayed, that O’Hara might be ordered to answer, and that the matter might be reheard. On'the 21st of the same month this application was dismissed with costs.
On the 25th of April, 1829, George Neilson, administrator of James Neilson, deceased, Eli Balder son, Benjamin Welch and Hugh Mullen, creditors, who had filed their claims against The .Cape Sable Company, under the decree, by their petition, not on oath, stated, that no payment had then been made to O’Hara under the order of the 15th December; that the time allowed by the notice given, as directed by the decree, for creditors to bring in their claims, expired on the 30th of December last; after which day, and before the passing of the order of the 15th of December, they had filed their claims; and, therefore, they had neither in point of law or of fact, any notice of O’Hara’s petition, or any opportunity of controverting his claim; that O’Hara had entered into a special contract to accept as a compensation for his services, much less than his legal fees; and yet had, in his petition, suppressed all mention thereof; thereby leaving the court to presume, that he was entitled to the full amount of his poundage fees. Whereupon they prayed, that O’Hara might answer; and that they might have such relief as seemed right, &c. ■ ■
27th April, 1829.
Bland, Chancellor.
Upon this petition I must repeat what I have said on the petition of Philip G. Lechleitner, that the order of the 5th of November last, placed it in the power of all who had a right to oppose the claim of William ■ O’Hara to do so on the day appointed. The matter of the foregoing petition, it is clear, might, then as now, have been offered as a cause why O’Hara’s claim should not be allowed; but it was not then presented. This petition assigns no reason why this matter was not then introduced by the parties who might then have done so. Whether this suit was then to be contemplated as a creditor’s bill or not; or, in whatever light O’Hara’s claim may be considered, it is very clear,, that it has been regularly put in issue, tried and adjudicated upon between him and those with whom, if at all, he contracted as is alleged, and of whom he had a right to make the demand. On a creditor’s bill the originally suing credi *643 tor’s claim having been determined to be valid, as between the then parties, can never be again questioned by any creditor who may thereafter come in; nor is there any instance in which a claim once established as between proper parties, can be again questioned by any one who may be thereafter allowed to come in and participate with either of the original litigants ; unless upon some ground of alleged fraud and collusion. (d)
Whereupon it is Ordered, that the foregoing petition of George «,Neilson and others, be and the same is hereby dismissed with costs.
After which the auditor made and filed a report, dated on the 18th of February, 1830, in which he says, that he had examined the proceedings of these cases, and staled all the claims exhibited against the estate of The Cape Sable Company. Claim No. 1, is for a judgment recovered by Robert Oliver against the said company, on which a fieri facias was issued and laid on all the real and personal estate of the company. The complainants by their bill of complaint impeached said judgment for fraud and irregularity. And by their exceptions, filed on the 20th of April, 1829, they object to the auditor’s report of the 29th of February, 1828, so far as relates to the said claim, because there is no sufficient evidence to sustain the said claim, and because said Robert Oliver has no legal or equitable claim against the said company, or its funds or property; and because said Robert Oliver, if a creditor at all, is to be deemed a general creditor, and not a judgment creditor, nor entitled to any preference, as a creditor, whatsoever. And by-other exceptions, filed on the same day, they deny, that said claim has any foundation in law or equity; and also deny, that, if deemed a creditor at all, the said Robert Oliver is to be considered a judgment creditor, or entitled to any preference whatsoever as a creditor; and also object, and plead the act of limitations against said claim. Similar exceptions have been filed by P. G. Lechleitner, who has exhibited a claim against the said estate. The auditor thinks he is bound to consider Robert Oliver as a bona fide judgment creditor, and allows the claim accordingly.
Claims No. 2, 3,4 and 5, are on judgments rendered against the company, and now entered for the use of Charles Carroll of Carrollton. The complainants and P. G. Lechleitner have filed objections to the said claims, similar to those before stated against *644 claim No. 1. The auditor reports, that those claims are also allowed as bona fide judgments.
The solicitor for Robert Oliver has instructed the auditor to allow claim No. 1, a preference over all other claims against said estate. And the solicitor for Charles Carroll insists, that No. 2, 3, 4 and 5, are to have preference over claim No. 1, and all other claims. The auditor is unable from the evidence now before him to determine this question of priority.
The said Philip G. Lechleitner has also relied on similar exceptions to claim No. 6; the claim of James Neilson, deceased. And the defendant Robert Oliver has, by endorsement on the said claim, objected, that the same is not due, and also, that it was barred by the act of limitations. As to the sum of $393 66, the principal and interest of Philip G. Lechleitner's note to and endorsed by Richard Cato9n, the said claim is destitute of proof; as there is no evidence to connect the said note with the transactions of the company. The residue of the claim is for the amount of two bills of said Lechleitner's, and one Gerard Troost on Alexander Mitchell, in favour of Richard Caton, and by the latter endorsed; which bills profess to be on account of The Alum and Copperas Company; of, as it is supposed, of The Cape Sable Company. To those bills is annexed a copy of a bill of sale, by said Lechleitner and Troost, to James Neilson and Rosewell L. Colt, of all the grantor’s interest in The Alum and Copperas Works at Cape Sable under their contract with The Cape Sable Company, in trust, amongst other things, to secure the payment of the sum of five thousand dollars due to said James Neilson, on certain promissory notes of said Lechleitner and Troost, endorsed by said Richard Caton, and Alexander Mitchell as agent of the said company, and discounted for said lechleitner and Troost, to enable them to carry on The Alum and Copperas Works at Cape Sable; and also all other debts which are or may be contracted by said Catón or Mitchell, or to which they or either of them may be a party bound by accepting, or endorsing, or otherwise for the use of said Lechleitner and Troost.
The auditor finds, that said Mitchell, Lechleitner and Troost, as agents, were in the habit of drawing, endorsing and accepting bills and notes on account of The Cape Sable Company, and that in the ledger book of the company, folio 8, the said James Neilson is made a creditor for amount of the said two bills. The last entry, in relation to these bills, is of the 31st of December, 1823. But the *645 defendants, including The Cape Sable Company, mad. Robert Oliver, on the 19th of March, 1827, under a commission issued in the causes, filed an account, W. 1; which professes to be an account of the debts due by the company, and states this claim to be at claim against the company. Under these circumstances the auditor submits, that the said claim is not barred by limitations. But. the auditor further suggests, that if those bills were intended to beseemed by the mortgage, before referred to, they are to be considered as given, in fact, for the proper debt of the drawer’s ; and The Cape Sable Company would be in the nature of a surety. The general usage, in the case of a claim filed against the estate of' a surety, is to require proof of the insolvency of the principal, debtor. He submits, whether the peculiar form of the contracts* which renders the company primarily liable at law, should exempt, this claim from the operation of the general rule.
Claims No. 7 and 8, are not proved in the usual manner. They are on notes of more than three years standing; and appear to be barred by limitations; which is pleaded by Robert Oliver.
The said Robert Oliver has also pleaded limitations against claims No. 9 and 12. But the auditor thinks they are not barred; as payments are proved to be made on account within three years. Claim No. 10 is not proved in the usual manner. The said Robert Oliver has also pleaded the act of limitations against claim No. 11. But by the auditor’s report, filed 8th of March, 1828, the said Eli, Balderson, the claimant, is made a creditor to the amount of $2,285 25, exclusive of interest. If, as the auditor is inclined to-think, the said report, prepared from materials furnished by the company, is evidence against the defendants to rebut the plea of limitations, there will be sufficient evidence to sustain the whole claim as. stated. The auditor’s report, so far as respected this-claimant, was ex parte; whereas, for the amount of his claim, he relies on an account stated between himself and A. Mitchell, the-agent of the company.
Claim No. 14 is the claim of Gerard Troost; who was, for several years, the manager or superintendant of The Cape Sable Company's Works. It commences in September, 1813, and continues to the year 1822. A number of vouchers have been filed to sustain the account; but so many are defective in form, that the auditor is unable to state any satisfactory account from them. He has found, amongst the papers filed by the company, an account which agrees substantially with the account now exhibited. It does not appear, *646 that the company ever accepted the said account; neither does it appear to have been rejected. But, considering the nature of the relation which existed between the parties, and the character of the expenditures made by the claimant; and that no further account was called for by the company, the auditor thinks, that the claim may be allowed without further proof; at least, to the extent of the payments proved to have been made by any of the vouchers exhibited, whether those vouchers be in form or defective. The claimant has also filed two little books, A. and B., which are proved to have been kept by one A. Hilgar, who was a clerk in the employ of the company, and is since dead. The books prove expenditures to the amount of $5,742 83 ; but as credits are admitted on general account to the amount of $7,264 19, it is supposed, that the claimant can derive no benefit from those books.
No. 15 is the claim of Philip G. Lechleitner, who was also an agent of the company ; and is of many years continuance. The claimant, from time to time exhibited accounts current, which seem to have been accepted by the company, and'entered upon the company’s books. But those books being kept upon mercantile principles; and exhibiting only general results in complex forms, between which and simple details, it is extremely difficult to institute a comparison, the auditor has endeavoured to test the accuracy of the accounts now filed with the aforesaid accounts current. He finds they correspond substantially from the commencement to the entry of the 21st of August, 1819, inclusive, except in the particulars stated in the schedule herewith returned. The charge of $394 70|, as of the first of July, 1821, is sustained by an entry in the day-book, folio 99; and the charge of $1,381 02¿, as of the first of May, 1823, is sustained by an account formerly exhibited, and an entry on the day-book, folio 124, for $1,381 85. The remaining charges from the 21st of August, 1819, are not sustained by vouchers. The auditor has, nevertheless, for the present, adopted the claimant’s statement and allowed interest from the 10th of August, 1824.
The claimant has also exhibited another statement; in which he adopts the balance stated to be due by the company’s ledger, folio 55; reserving to himself the liberty of shewing errors, which, he alleges, exist to a considerable amount. The auditor has restated the claim upon those principles as claim No. 16. In the first place the claimant adds to the balance, appearing due on the books, the amount of additional expenditures since the last entry therein; say *647 the 31st of December, 1823. The only objection to this part of the claim is, that no vouchers are exhibited to sustain it.
He next claims for amount of a draft supposed to have been drawn by the claimant on Alexander Mitchell, in favour of Richard Caton, at six months, for $2,500; which is charged to him in day-book, folio 93. The books appear to have been made up some time after the transactions recorded had taken place; and by an accountant who does not seem to have had any personal knowledge of the affairs of the company. And immediately after the entry, the accountant adds this memorandum. ‘There is some doubt as to the correctness of the dft. of $2,500 being ch’d as above; but neither Mr. C. nor Mr. M. seem to be prepared to explain the transaction; therefore, it is deemed advisable to make this entry for the present, with the advice of Mr. C., to be investigated in future.’ As the proposed investigation has never taken place, and as no explanation has been made to the auditor, it is submitted, that the claimant is entitled to he relieved from this charge.
The third error charged is for the amount of Snelling and Mason's acceptances of the claimant’s drafts for $940 and $650, entered in day-book, folio 69; which is supposed to be a double entry for the proceeds of the first acceptance, entered in folio 23, for $931; and of the second entered in folio 25, $518 10. The auditor thinks those entries relate to the same transactions. But in folio 22, there is a cross entry for the proceeds of the first acceptance; and in folio 25, there is a cross entry for the proceeds of the second acceptance; which neutralize the former entries in folios 23 and 25, and leave the claimant chargeable only with the nominal amount of the acceptances as charged in folio 69. The transaction appears to be as follows. The company had consigned a parcel of alum to Snelling and Mason of New York; and, in anticipation of sales, the claimant drew the bills in question on Snelling and Mason in favour of Alexander Mitchell; who discounted the same, and remitted certain sums, as the proceeds thereof, to the claimant at Philadelphia, with the sum so remitted he is chargeable, but with nothing more. The auditor, therefore, thinks the error consists in charging the claimant with the nominal amount of his drafts, $1,590, instead of the sums remitted to him as the proceeds thereof, $1,449 10.
The fourth error is for amount of account of I. and A. and W. B. Post, $195 51; as of the 9th of December, 1820, charged in *648 day-book, folio 99. As the articles included in this account, from their nature, and from the entries on the books, appear to have come to the use of the company, the claimant seems to have been improperly charged as between Messrs. Post and himself, unless a cross entry is made, allowing him the amount as against the company.
The fifth error alleged is for amount of two drafts on and accepted by A. Mitchell in favour of R. Caton, at four months; the one dated the 19th of February, 1822, for $649; and the other dated on the 10th of February, 1822, for $623 43. In day-book, folio 65, the claimant is made debtor to drafts accepted for amount of those drafts, and in folio 93, is made debtor to the company for payment of the same drafts by A. Mitchell, agent. The auditor thinks that this error is proved.
But in the sixth place, the claimant denies his liability for the amount of the draft for $623 43; insisting that it should be charged in account to Dr. Troost. But no evidence of Troosfs liability has been furnished; and in the absence of such evidence, the claimant should not be relieved from the charge.
The seventh error complained of, is for the claimant’s draft in favour of Charles F. Mayer for $50. It is alleged, that this draft has not been paid by the company. But no proof has been furnished, by which the auditor could try the correctness of this allegation. The auditor, therefore, thinks, that the error is not proved.
The last error is for amount of the capital furnished, or supposed to have been furnished by the claimant. He claims for capital, and additional capital, the sum of $9,166 66; and for negro capital the sum of $1,197 70. The former sum is entered in leger, folio 9; but he is clearly mistaken in supposing, that he has been charged with the amount of his negro capital. The auditor has, therefore, made a deduction only of the amount of capital and additional capital. But to this reduced allowance the auditor objects; because, as capital, it cannot be considered a claim on an equality with the claims of creditors of the company, but should be introduced in an account of distribution of surplus estate, if there be any surplus, among all the capitalists. And if the auditor be correct in this opinion, the claim should be further reduced by the amount of negro capital, to the amount of which the claimant’s advances are applicable. For the same reasons, the amount of capital to be contributed by the claimant, viz. $10,364 36, should *649 be reduced from the amount of claim No. 14; no credit having been allowed therefor in said claims.
But the auditor further reports, that by an agreement made and entered into between Richard Catón and others, who were after-wards incorporated by the name of The Cape Sable Company, of the first part, and said Philip G. Lechleitner and Gerard Troost of the second part; and dated on the 25th of September, 1813, the said Lechleitner and Troost engaged to erect and establish, on the lands at Cape Sable, belonging to said Richard Catón and others, works for making copperas and alum; and to carry on and superintend the same; and to supply and furnish one-half part of the whole capital that might be found necessary for so establishing and carrying on said works. By a subsequent article of the same agreement, the said Lechleitner and Troost undertook to furnish all the capital, above five thousand dollars, which should be necessary for the purposes aforesaid ; and provision was then made for distribution of the profits of the works between the parties to the agreement. The auditor thinks, that this agreement made said Lechleitner and Troost co-partners with the said Catón and others; and with The Cape Sable Company, since its incorporation; and as such their claims, for capital, or for additional advances, should be postponed to the claims of the mere creditors of the company. This objection applies to claims No. 14, 15 and 16. It may be proper to remark, that P. G. Lechleitner is charged on the books of the company with the whole amount of capital, stipulated to be furnished by said G. Troost and himself.
The auditor further reports, that said P. C. Lechleitner by a writing, dated on the 26th of September, 1816, in consideration of some money lent, assigned to Paul Busti, since deceased, all his right and interest in the copperas and alum manufactory at Cape Sable, and the whole amount of his advances made for the same, as security for moneys lent, or to be lent; and also for notes discounted by said Busti for said Lechleitner; that by a deed, bearing date on the 31st of August, 1820, the said Lechleitner and Troost assigned unto Rosewell L. Colt and James Jfeilson, all their right, title, interest and estate in and to the aforesaid works, as used and enjoyed by them under their contract wdth the company, in trust, to secure the payment of certain moneys due from said Lechleitner and Troost to said Rosewell L. Colt and James Jfeilson; a copy of which is filed with claim No. 6. And by another deed, executed on the 10th of August, 1822, the said Lechleitner assigned unto said Paul *650 Busti all his share, right, interest, claim and demand in and to the aforesaid works, and also all claim and demand, that he might have against the said works, for advances of money made for the said establishment. This last deed notices the assignment of the 26th of September, 1816 ; and professes to be made to secure the payment of the sum of $10,296 48, as of the first of January, 1822. The auditor thinks the claims of said Lechleitner and Troost, if established, will be liable for payment of said claim No. 6, in the first instance; and that the residue of the said claim of said Lechleitner, to the extent of the sum of $10,296 48, with interest from the first of January, 1822, will be payable to the said Paul Busti’s representatives.
The auditor further reports, that the trustees have not yet obtained an allowance for their expenses; and that the claim of said P. G. Lechleitner which was, by an order of the 24th of September, 1829, referred to Samuel Moale, William Gwynn, and Charles F. Mayer, has not yet been adjusted. He is therefore unable to state an account with the trustees.
After this report of the auditor was filed the plaintiffs excepted to it; because it allowed the claims of Robert Oliver, Charles Carroll, Eli Balderson, and James Neilson, who have in truth no claim whatever, legal or equitable, against the estate of The Cape Sable Company; because their claims, if any they have, are not sustained by any proof; and because each and all of them is and are barred by the statute of limitations. And the defendants excepted to it, because it did not charge to P. G. Lechleitner the sum of $17,000, borrowed by the Cape Sable Company for him by the resolve of the 4th of February, 1822, and to him advanced.
The defendant Robert Oliver excepted to this report. First. Because it did not award to him, as a judgment creditor, a satisfaction in preference to all others. Second. Because the claims of James Neilson, No. 6; of Leonard Foreman, No. 7; of Benjamin Welsh, No. 8; of Hugh Miller, No. 9; of James A. Sangston, No. 10; of Eli Balderson, No. 11; of Mary Mullen, No. 12; of Edme Ducatel & Sons, No. 13; of Gerard Troost, No. 14; and of Philip G. Lechleitner, No. 15 and 16, are not sufficiently proved; and are barred by the act of limitations. Thirdly. Because the claims of Troost and Lechleitner are without any foundation in law or equity. Fourthly. Because the claimants of Troost and Lechleitner were partners with The Cape Sable Company; and, as such, not only not entitled to be allowed any thing, but are personally *651 responsible to this exceptant Robert Oliver. And, lastly, Because The Cape Sable Company cannot be held liable for the claim of James Neilson, No. 6, until it shall have been proved that P. G. lechleitner and G. Troost are insolvent, which has not been shewn and is not the fact.
The defendant Charles Carroll excepted to this report. First. Because it does not award to him, as a judgment creditor, whose claims are No. 2, 3, 4 and 5, a preference to all other claims. Secondly. Because it should have allowed no other claims than that of Robert Oliver, No. 1, and that of this exceptant. Thirdly. Because it allows the claim of P. G. Lechleitner, No. 15 and 16, when, in fact, he is largely indebted to The Cape Sable Company. Fourthly. Because P. G. lechleitner is not charged with many, and large sums of money, that appear from the proceedings to be due from him to The Cape Sable Company. Fifthly. Because it does not allow the judgments marked as claims No. 1, 2, 3, 4 and 5.
Philip G. lechleitner for himself, and on behalf of J. J. Vanderkemp, executor of Paul Busti, excepts to this report. First. Because it is wrong in admitting the claim of Robert Oliver as a bonafide and regular judgment. Secondly. Because Oliver’s claim is altogether inadmissible, as an equitable claim, or as that of a general creditor ; is unsustained by any evidence; and is barred by the statute of limitations. Thirdly. Because Carroll’s claim is not sustained by any evidence; is not admissible as a bonafide and regular judgment claim ; or as that of an equitable or of a general creditor; and is barred by the statute of limitations. Fourthly. Because the claims of Eli Balderson and James Neilson are unsupported by any evidence; and are barred by the statute of limitations. Fifthly. Because it has rejected from his claim, No. 16, the items designated as expenditures since the last entry in The Cape Sable Company’s books of December 31st, 1828; and also those designated as the third, sixth, seventh, and eighth, or last errors claimed by him to be corrected; and insists, that the amount of capital, additional capital, and negro capital, ought to be deducted from the amount of his claim. Sixthly. Because it insists, that the assignment to James JVeilson and Rosewell L. Colt by this exceptant, entitles Neilson’s claim to he paid out of this exceptant’s claim, No. 16, in preference to Paul Busti. Seventhly. Because it ought to have allowed his claim absolutely and fully as he has stated it, and without any reservation or deduction. And *652 eighthly, Because it declares, that Lechleitner and Troost are not respectively, or in any way to be considered as partners of The Cape Sable Company, or of the persons composing the association incorporated as The Cape Sable Company; or that any agreement of them, or either of them exists as stated.
Leonard Foreman, Benjamin Welsh, and James A. Sangston, rely on the first, second, third, and fourth exceptions of Lechleitner ; and aver, that their respective claims are fully proved, and are not barred by the statute of limitations.
Gerard Troost relies on the first, second, third, fourth, and eighth exceptions of P. G. Lechleitner; and also excepts to it, because it insists, that his claim ought to be lessened by any deduction for capital, additional capital, or negro capital; and because of its denying the sufficiency of his vouchers fully to sustain his claim.
And William O’Hara also excepted to this report, other than so much of it as relates to the judgment claims. First. Because they are not proved according to law. Secondly. Because they never had any legal existence. Thirdly. Because they are barred by limitations. And he also relies on all the objections made by the auditor against the claims therein mentioned.
The claim of Philip G. Lechleitner for an allowance out of the proceeds of sale for certain fixtures to which he asserted a right, and which were included with the property sold, having been referred to arbitration, the arbitrators returned an award; which, by an order passed on the 27th of April, 1831, was finally ratified and confirmed.
After which the auditor made another report, bearing date on the 19th of May, 1831, in which he says, that he had, at the instance of William O’Hara, stated an account between the trustees and the estate of The Cape Sable Company, whereby the proceeds of sale are applied to the payment of the trustees’ allowance for commissions, the costs of this suit, the claim of William O’Hara for poundage fees, as directed by the order of the 15th of December, 1828, on $26,410, the appraised value of the personal estate taken in execution at seven and a half per cent, on $26 67, and three per cent, on the residue. And on $432 87, the balance, as real estate, at three-fourths per cent.; amounting to $796 75; with $7 26 costs of his petition; and the sums awarded to Philip G. Lechleitner, leaving an unappropriated balance of $20,164 98. But although the whole of P. G. Lechleitner’s claim, as adjusted *653 by the award is allowed in said account; yet the auditor begs leave to suggest a doubt whether the claimant is entitled to any preference over other claimants as to the sum of seven hundred and fifty dollars, agreed and awarded to be paid to him for submitting to an arbitration of his claim.
This report of the auditor, as regards the claim of O’Hara, by an order of the 24th of June, 1831; and as regards the arbitrated claim of Lechleitner, by an order of the 22d of July, 1831, no cause having been shewn, although notice given, was finally ratified and confirmed: and the trustees directed to apply the proceeds accordingly.
The auditor, in a report bearing date on the 30th of January, 1832, says, that in obedience to the instructions of the solicitor of The Cape Sable Company, of Caton, and of Carroll, he had restated the claim of Philip G. Lechleitner. Adopting his former statement of said claim No. 16; he has credited the same by the amount of It. L. Colt’s account for P. G. Lechleitner’s notes mentioned in the resolve of the company of the 4th of February, 1822, and interest thereon from the 31st of December, 1821. And by the balance of the sum of $17,000, borrowed under said resolve for said Lechleitner, to be used under his contract of the 25th of September, 1813. And by interest on said sum of $ 17,000, from the 20th of February, 1822, to the day of sale.
The auditor has adopted the statement of said claim No. 16, because it was the more favourable statement for the parties who required his further account. And he has confined himself to the allowance of the credits before mentioned, because they were specifically required by his instructions; and because the exceptions filed by the defendants on the 14th of November, 1831, seem to admit, that in all other particulars, the auditor’s statement of said claim is correct. The auditor retains the opinions which he expressed in his report of the 18th of February, 1830. And he does not clearly perceive, that the said claim can be credited with the aforesaid sum of $17,000, upon any principle which will not render the said Lechleitner equally liable for all other debts of the company.
And as it may be inferred from the instructions in obedience to which the present account is stated, that the auditor’s opinions, expressed in his former report, are misunderstood, he begs leave to submit the following remarks in explanation.
The opinion is still entertained, that the agreement of the 25th of September, 1813, made the said Philip G. Lechleitner and *654 Gerard Troost, co-partners with the said Richard Caton and others; and with The Cape Sable Company since its incorporation ; and as such their claims for capital on additional advances, should be postponed to the claims of the mere creditors of the company. And, as a consequence, the said Lechleitner and Troost are personally liable for all contracts and engagements entered into by the company in furtherance of the objects of the association.
The auditor distinguished the claims of the said Lechleitner and Troost for capital from their claims for additional advances; because the distinction was made by the said Lechleitner in his own statements; and was recognized by the books of the company. But the agreement of the 25th of September, 1813, to which the auditor referred, converts all advances of the said Lechleitner and Troost, until profits were made sufficient to meet disbursements, into capital, and provides for their reimbursements as capital. The aforesaid claims are therefore to be treated as the claims of co-partners for capital advanced to the common stock.
The aforesaid agreement provides for a distribution of partnership property in the event of a dissolution; which was operated by a decree in this case. But as, in the auditor’s opinion, the concern is insolvent and inadequate to the payment of debts, the auditor supposed it was unnecessary to attempt an adjustment of the claims of the partners. The claim of P. G. Lechleitner was stated, because it was filed and insisted on as a claim of a creditor. The auditor’s report was intended to exhibit the facts on which the claim was founded, and the equities which might be supposed to arise thereout, considered as the claim of a creditor. But the auditor submits, that his said report does not admit the said Lechleitner as a creditor to any amount whatever.
After which, on the application of the defendant Oliver, it was, on the 9th of May, 1832, Ordered, that the auditor’s reports and the exceptions thereto stand for hearing on the 8th of June following ; provided a copy of the order be served on the exceptants, or their solicitors, on or before the 20th instant. And copies having been served accordingly, the matter was afterwards brought before the court.
18th August, 1832.
Bland, Chancellor.
This case standing ready for hearing on the auditor’s reports, and the exceptions thereto; and the solicitors of some of the parties having been heard, and the notes of the solicitors of some others of them having been read, the proceedings were read and considered.
*655 It is a general rule, that all liens and incumbrances which are not in themselves vicious or defective must be satisfied according to their respective priorities, (e) Two of these parties, Oliver and Carroll, rely on their judgments as giving them liens which entitle them to be satisfied in preference to all other creditors of The Cape Sable Company. These plaintiffs and some of the other creditors, however, not only deny the legality of their liens, but the very existence of their claims; and as between Oliver and Carroll themselves, each claims a priority over the other. It will, therefore be necessary to enquire whether they are in truth to be considered as judgment creditors and from what date.
Upon the principles of equity by which this court has been so long governed in relation to the distribution of the estate of an insolvent living person among his creditors; and in regard to the application of the estates of deceased persons to the payment of their debts ; upon the ground that creditors have by the misfortunes or death of such debtors been confined to a single fund from which alone they can obtain satisfaction; I can see no reason why this court may not, upon the same principles, where a corporation is admitted or shewn by proof to be in a condition of absolute insolvency, and especially if such insolvency must inevitably eventuate in its total dissolution, take cognizance of the matter, call in its creditors, and apply its effects in satisfaction of their claims, according to the course of proceeding in a creditor’s suit, (f) And this case having heretofore, by the admissions of the parties, been submitted as a creditor’s suit, I shall therefore continue so to consider and treat it.
The decree of the 5th of April, 1828, is founded not only on the admitted fact, that these debts were then due from the company to Oliver and Carroll; but also upon the concession, that The Cape Sable Company was then in a condition of absolute insolvency. That decree, and the agreement upon which it was passed, there being then no other creditors but Oliver and Carroll before the court, necessarily involved these facts and admissions; because the court could not, otherwise, have treated the case as a creditor’s suit, and have ordered a sale to pay debts, none of which were then admitted or established; nor could the court have ordered notice to be given to the other creditors to bring in their claims upon any other *656 ground, than that the debtor then before court had been admitted or shewn to be in such a condition of insolvency as rendered an equal and equitable distribution of its estate among its creditors proper and necessary. Hence it is clear, in this as in every other similar case of a creditor’s suit, that neither the plaintiff, nor those who come in under the decree, can now be allowed to draw in question and again put in issue any claim of any creditor whose claim has been thus established; except upon the ground of fraud and collusion of the then parties.
Here, however, these plaintiffs now again, and Lechleitner and others, who have come in under this decree, as creditors of The Cape Sable Company, have, by their exceptions to the auditor’s report, not only denied the validity of these claims of Oliver and Carroll as judgment creditors, but have also denied that they can be considered as creditors of that company at all, or to any amount. But these matters have been heretofore put in issue; and, after a full investigation have been finally and by consent adjudicated upon; and therefore, must now be considered as entirely at rest; since, if it were otherwise, there would be no end to litigation.
But although it has been finally established, that Oliver and Carroll are to be considered as judgment creditors; yet as it has not been distinctly declared on which of their judgments they shall be compelled to rest their claim, it will be necessary now to ascertain that, in order to determine how they are to take rank in relation to each other.
It appears, that Oliver’s first judgment was obtained on the 9th of December, 1822, in Anne Arundel County Court; and that its execution was stayed by an injunction from this court; for causes explained in the orders of the 21st of April, 1823, and the 7th of May, 1824; and because of its having been obtained in the court of a county not the proper residence of The Cape Sable Company.
As to what may be deemed the residence of a corporation, it may be well to recollect, that, as no government can give to its laws any extra-territorial operation, all bodies politic must necessarily be considered as artificial beings of that country by whose government they were incorporated; and alien entities in all other countries; that a corporation may, in the country of its origin, have a fixed locality and residence, from its nature and the terms of its creation; as a city, town, &c. And that all corporations; such as banks, &c. which are transitory in their nature; and which *657 are not limited to any place by the terms, and nature of their creation and objects, may be considered as domiciled, for some purposes, in that county of the state, by the government of which they have been created, where they transact their business; and for other purposes in that county in which their property is held, (g) It is said, that the name of a body politic is sometimes taken from the place of its residence; because a corporation has a fixed place where it is settled, and whence it cannot be removed, like a natural person; and therefore, that a distringas against it to compel an appearance, or obedience to an order or decree, must be directed to the sheriff of the county wherein it is resident, (h) In some cases the Legislature has anticipated and removed all ambiguity and difficulty in relation to this matter by expressly declaring, that suits against it shall be prosecuted in the county court of the county in which the president of the body politic shall reside. (i)
Admitting it, however, to be true, as a general rule, that all process against a corporation should be directed to the sheriff of that county of which it is resident; that there may be corporations liable to be sued any where, because of their having no distinctly fixed place of residence; and that this judgment, confessed in the court of Anne Arundel county, cannot be deemed illegal, because of that county not having been the residence of The Cape Sable Company; yet, as its act of incorporation has declared, that a meeting of its stockholders shall be held on the first Monday of April of every year, in the city of Baltimore, (j) the law has, so far as a special domicil can be given to such an institution, fixed its local habitation in the city of Baltimore. It is therefore clear, that this case comes within the spirit, if not within the letter of the provisions of those acts of Assembly which declare it to be unlawful to sue or arrest any inhabitant out of his proper county, or where he may happen to be found about his necessary affairs out of the county where he resides. (k) And, as it is obvious, that a fraud may be more easily practised by suing and obtaining a *658 judgment against a corporation in a county different from that of its visible and public location, the confession of a judgment in a court not having jurisdiction over the place of its residence, is a fact which should not be overlooked in an investigation of a charge of fraud, alleged to have been perpetrated by means of such a proceeding.
But although this court could not revise or reverse the judgment which Oliver had obtained in Anne Arundel County Court, yet its defects and infirmities, as indicated, were so palpable, that as he, himself, declares in his answer, he deemed it a mere nullity, which it was most prudent at once to abandon, and endeavour to authenticate his claim by a correct judgment; and, that, being so advised, he instituted a suit in Baltimore County Court, upon which he obtained that judgment on which he now relies; the proceedings upon which have been stayed by the injunction in this case.
This last judgment of the 26th of May, 1824, was also assailed by these plaintiffs upon the ground of its having been illegally and fraudulently confessed, with an intention, lhat it should operate as a lien, or mortgage upon the property of the company; and of its being about to be used as a means of having their whole property taken in execution and sold, so as to sacrifice the interests of the plaintiffs ; and thus, indirectly to thrust them out from all connection or concern With the body politic. These allegations of the plaintiffs, on the motion to dissolve the injunction, appeared to be sufficiently sustained to have that restriction continued until the final hearing or further order.
But since the passing of that order, continuing the injunction, much testimony has been taken; and the result has been, that the plaintiffs have totally abandoned the original cause of their complaint. And first, by the decree of the 8th of March, allowed their bill to be dismissed; and then, by the decree of the 5th of April, consented, that all the estate of The Cape Sable Company, the protection of their interests in which was the sole object of their suit, should be sold for the satisfaction of this claim of Oliver’s, among others, against that company. Hence, although, it may be true, that this last judgment may have been confessed with an intention that it should operate as a mortgage; and without the consent of three-fourths of the stockholders owning three-fourths of the shares; yet the assent to the decree in this case amounts to a virtual and clear relinquishment of that objection, arid to an admission, that this judgment, upon which Oliver now *659 relies, is entirely correct. But as this provision of the act of incorporation, requiring the assent of three-fourths of the stockholders owning three-fourths of the shares, was intended exclusively for the benefit of stockholders, there are no other persons than these plaintiffs, or some other stockholders, competent to make such an objection. Here, however, all parties have consented to this decree; and, consequently, this judgment of Robert Oliver, of the 26th of May, 1824, must now be considered as altogether well founded and conclusive.
Charles Carroll also claims as a judgment creditor of The Cape Sable Company; and his claims, as No. 2, 3, 4 and 5, have been opposed by objections similar to those directed against that of Robert Oliver. But as CarrolPs claim as a judgment creditor has been, in like manner, put in issue, as fully investigated, and as effectually established by the decree of the 5th of April, as that of Oliver, it cannot be now again made the subject of litigation by these plaintiffs, or by any other creditor coming in under that decree.
But Oliver insists upon a right to have his claim first satisfied out of these proceeds, on the ground, that his lien upon them is prior to that of CarrolPs.
These defendants Love, Slye and .the Barbers, obtained their judgments against The Cape Sable Company in Baltimore County Court at its March term of 1822; and Carroll now claims as the assignee of those judgments. But it appears, that executions were issued, on the 2d of September, 1822, on those judgments, and returned nulla bona to that court; after which writs of fieri facias were issued returnable to April term, 1823, of Anne Arundel County Court. And then, after more than one year had elapsed, without any further proceedings being had, by a writing, filed on the first of June, 1824, it was agreed, that writs of execution should he issued out of Anne Arundel County Court, without any steps being taken to revive them; and on the same day executions were issued accordingly, and levied on the property of The Cape Sable Company, which were stayed by the injunction in this case. Immediately after which, on the 4th day of the same month, Carroll instituted actions of debt on those same judgments, and obtained judgments by confession on the same day.
Whence it is clear that as no execution could then have been issued on the four original judgments of 1822; the lien which they gave had expired, and was barred by the common law limita *660 tion and presumption of satisfaction on the 26th of May, 1824, when the lien arising from Oliver's judgment attached. And, therefore, as I have shewn upon a former occasion, (l) the lien of those judgments held by Carroll, could not have been so revived, even by a scire facias, much less by a mere agreement between the parties to them, as to overreach that lien of Oliver's judgment, which had, in the interval, fastened upon the real estate of the defendant. Taking it for granted then, that all the proceedings of Anne Arundel County Court, upon those four judgments, held by Carroll, were in every respect regular and valid, still Oliver's lien is entitled to a preference in satisfaction. But, notwithstanding what Carroll has said in his answer, the lien arising from his judgments of Anne Arundel County Court, was virtually relinquished by him, by the institution of the suits and the judgments obtained by him in Baltimore County Court, on the 4th of June, 1824; and, consequently, upon this ground also, Oliver's judgment must be respected as a prior lien to that arising from those held by Carroll, and must be allowed a preference in satisfaction accordingly.
It is here proper, however, to recollect, that the act of Assembly which enlarges the time within which a fieri facias may be issued on a judgment to three years; and, consequently, so far prolongs the continuance of a judicial'lien, does not apply to any judgments rendered before the 19th of February, 1824, when that law was passed. (m)
But these judgments on which Oliver and Carroll found their claims were all of them rendered in Baltimore County Court; and it is insisted, that they cannot therefore be considered as liens upon any of the real estate of The Cape Sable Company, not lying within the jurisdiction of that court. This is a point of law which it is said, yet remains to be finally determined.
I have, upon a former occasion, endeavoured to trace the origin and fully to explain the nature and extent of a judicial lien within the range of the jurisdiction of the court in which the judgment was rendered. (n) And it appears, that this lien, which is not given in express terms, by any legislative enactment whatever, is an incident or consequence arising, according to the principles of the common law, from that statute which declared, that lands should be liable to be taken in execution for the satisfaction of such judg *661 merits. The lien was considered as necessarily arising from the liability of the land to be taken in execution; and, therefore, the statutes which gave the elegit, the statute staple, statute merchant, and recognizance, all alike carried with them this lien, as an inseparable incident of the liabilities they imposed. Hence it was regarded as a general rule, that no such lien could be fastened upon any species of property which was not so liable to be taken in execution. And, consequently, upon the same principles, that no such lien could attach upon any lands lying out of the jurisdiction of the court in which the judgment was rendered, and beyond the reach of any execution which could be issued from it. (o) And this was, in truth, the general rule of the common law in relation to this lien.
The jurisdiction of all courts of common law is confined within certain prescribed territorial limits. They are either themselves, in this respect, circumscribed within particular local divisions; or, if their jurisdiction embraces the whole state, they can only act through the agency of such officers as sheriffs, whose powers extend only over certain counties or districts of the state; and all their process has an express reference to such territorial divisions of the state. (p) Hence it is, that at common law, even criminal process was not allowed to run from county to county; nor was there any civil process emanating from any court, however comprehensive its jurisdiction, which could be directed indiscriminately to all, or to any sheriff, or any executive officer of any other class, to be executed wherever the party or his property might be found within the state.
In England, in all actions instituted in the courts of Westminster, the plaintiff was obliged to give to his cause of action a venue or locality, as well with a view to its being placed in the most suitable situation for trial, as that he should thereby designate those territorial executive officers by whom alone the law could be enforced; and a jury convened for the trial of the disputed facts. (q) And, therefore, although the general jurisdiction of those courts extends over every county of the realm, yet that jurisdiction is nothing more than an aggregation of the several county jurisdictions ; for, nothing is -within their reach which is not to be found within the body of some one of those counties; and which cannot *662 be taken in execution by an executive officer of a county to whom alone they can direct their process. A writ of capias from those courts either to answer, or to make satisfaction, must, in all cases, be directed to an officer of a county where the venue has been laid, or where the cause of action is said to have arisen; and only, on its actually, or by a fiction being supposed to have failed, can a testatum, capias be sent to any other county. And so, too, a Writ of fieri facias must really, or in form be first sent to the proper county, and if that fails, then a testatum fieri facias, or an elegit may go to any other county where the property of the defendant may be found. (r)
It is by this course of proceeding only that any lands in England can be considered as lying within reach of the process of the several courts of Westminster, as liable to be taken in execution; and, therefore, as being bound by a lien arising from a judgment rendered there. This liability, it is obvious, is, as often as otherwise, by a secondary, and not by a primary and immediate execution; by a testatum, fieri facias, after an antecedent real or pro forma writ; and yet it is admitted, on all hands, that a judicial lien immediately fastens from the date of such a judgment upon all the lands of the defendant in every county of the realm, (s) This lien, therefore, is a uniform consequence of the liability, without regard to the mode, direct or indirect, of that liability.
But where the power of the court is confined to certain specified subjects, or within some particularly designated territorial limits its process can reach nothing not falling within the specification of the objects of its power, or which cannot be found within the local limits of its jurisdiction. Hence it is, that the judgment of an inferior court cannot be executed upon any lands or goods out of its jurisdiction; and, consequently, it cannot give rise to any lien upon such land; because it is not, in fact, as to such judgment, in any way liable to be taken in execution under it, either directly or indirectly, (t) For, even if it should be removed into the King’s Bench, by certiorari, the party must there sue out a scire facias to have execution, and therein set forth the nature of his judgment, and specify the particular limits of the inferior jurisdiction, and pray execution only within those limits. If, however, it be removed by writ of error, and is affirmed, it is otherwise, be *663 cause, by the affirmance it becomes a judgment of the Court of King’s Bench; and, as such, an execution may be had thereon co-extensively with the jurisdiction of that court. (u)
But there are cases in which the judgment of an inferior court may be removed into one of the superior courts for the express purpose of enabling the plaintiff, by a more general execution, to reach the property of the defendant lying beyond the limited jurisdiction of the court in which his judgment was obtained. So that although the land of the defendant, lying beyond those limits, could not be taken in execution by any writ issuing directly from such inferior court in which the judgment was rendered; yet as there is a settled and established course by which it may be made liable, the lien fastens immediately, as a necessary consequence of that liability, without regard to the circuitous course whereby alone such liability may be made effectual.
In the case of a statute merchant, statute staple, or recognizance, which, in England, have obtained the name of pocket judgments, if the conusor be out of the jurisdiction of the mayor, or cannot be found within the staple, or has no property within those limited jurisdictions, the statute or recognizance may be certified and sent under seal into Chancery, whence execution may be issued against the lands and tenements, goods and chattels of the conusor returnable to the King’s Bench, or Common Pleas. And, therefore, in all such cases, the lien fastens from the date of such a pocket judgment; although the mode of making it effectual can only be by removing it from the local tribunal before which it was rendered, and sending it into one of the superior courts, there to obtain an execution to be returned into another of them. (w)
It is obvious, that it could not fail to be attended with very great inconvenience, in most cases, to every one to be sued abroad, or at a distance from his place of residence; and especially where the civil process by which he may be called upon to answer, authorizes an arrest and detention of his person. To subject any one to such a course of judicial procedure within any jurisdiction where he does not reside, places it in the power of malice to have him imprisoned far away from his home, his friends *664 and resources; and affords the means of practising much fraud and oppression. To prevent which, and for the facility of traveling, the law of Scotland requires a residence of forty days, to subject even a foreigner to be sued in the courts of that country. (x)
In the year 1714, the Legislature of Maryland, reciting, that the people had greatly suffered by the then war; and that their miserable and deplorable circumstances were very much heightened and aggravated by their being sued and brought to Annapolis from the remotest parts of the province, to their manifest oppression and impoverishment, among other things, enacted, that where the debt or damages did not exceed twenty pounds sterling, the debtor should only be sued in the county court of the county in which he resided, and not elsewhere; (y) which act was, from time to time, continued and revived until the year 1794, when it was suffered to expire, (z) This act, however, provided only a partial remedy for the evil it proposed to remove; and therefore, afterwards, on its being represented to the General Assembly as a very great grievance to the people, that there was not a sufficient provision made against arresting them when they happen to be found about their necessary affairs out of the county where they reside, it was enacted, that no inhabitant should be arrested by a capias ad respondendum, or a capias ad satisfaciendum, out of the county in which he resided, until after a return of non est on such writ. (a)
This law applied to all such writs, from whatever court they might issue; and therefore, although the jurisdiction of the General Court, then in existence, extended over the whole state, this law made it necessary, that its process, for the arresting of a defendant, should be first directed to the county in which he resided; and consequently, as in England, a testatum capias, or a process in nature of such a writ, was the only one which, in many cases, could be sued out. And upon the principles of the English law, it is obvious, that the General Court must have used an execution, if not precisely the same, yet in all respects equivalent to a testa *665 turn fieri facias; because two or more writs of fieri facias could not be issued from that court, any more than from the King’s Bench, at the same time directed to two or more different counties ; but could only go consecutively to the same or to different counties, until an entire satisfaction was produced; (b) and yet it wms never doubted here, that a judgment rendered in the General Court gave rise to a lien upon the defendant’s lands in every county of the state.
But according to these laws, in those cases where the suit could be brought no where else than in the court of the county in which the defendant resided ; and, in all other cases where it was in fact brought there, all the process of the county court, being, by the general principles of the common law, confined within its local limits, it followed, as a necessary consequence, that no property of the defendant, not to be found within such county, could be taken in execution, in satisfaction of such a judgment; and therefore, that no judgment of a county court could operate as a lien upon any of the lands of the defendant lying out of that particular county; unless there was here, as in England, some means of removing the judgment into some superior court from which a more general and comprehensive scope of executive process might be taken.
It seems to be not altogether improbable, that some such course of proceeding, at one time, might have been allowed and pursued here. For, it is declared, by one of the Provincial acts of Assembly, that when any person against whom any judgment shall be given, in any county court, shall fly, remove, or absent himself out of the jurisdiction of that court, that then the plaintiff, for the more easy obtaining of the fruit of such judgment, may take the transcript of the record of such judgment, under the seal of the court, and lay the same before the county court where the defendant shall happen to be, which transcript shall be entered upon the records of such county court, who shall award execution thereon by a capias ad satisfaciendum, fieri facias, or attachment for the debt, damages, and costs, together with the additional costs of such court, ‘without suing out any writ of scire facias.’ (c) From which last expression, dispensing with a scire facias, it would *666 seem to be allowable to infer, that some such practice had prevailed here, as in England, as that of removing a judgment from a county court to the General Court, and suing out a scire facias for the purpose of obtaining an execution from that court, as upon its own judgment. (d)
But however that may have been, it is clear, that no execution, of any kind, could be issued under this act upon any judgment rendered in a county court, and be executed in another county, or made returnable into another county court, unless in pursuit of a defendant who had himself given a proper foundation for such a course of proceeding by flying, removing, or absenting himself from the jurisdiction of the county court in which the judgment had been obtained. And therefore, it is sufficiently clear, that this law, which was intended to meet a peculiar and extraordinary state of things, cannot be considered as having prescribed any regular course of proceeding whereby the lands of a debtor might be made liable to be taken in execution. And besides it must be borne in mind, that the statute subjecting lands to be taken in execution by a fieri facias, did not pass until the year 1732; (e) that at that time lands could only be taken in execution by a writ of elegit; and that this act specifies only such executions as could then only go against the person, or the personal property of the defendant. Whence it is clear, that there is nothing in this law which can be considered as having so enlarged the force of a judgment of a county court, as to render any lands liable to be taken in execution under it which were not liable before; and consequently, it gave no lien upon any lands of the defendant lying beyond the jurisdiction of such county court.
By an act of Assembly, passed during the revolution, it is declared, that the clerk of a county court shall, on application of the plaintiff in any judgment of his court; issue execution against any defendant who hath removed from the county in which such judgment is had to another county; which execution shall be directed to and served by the sheriff of the county where such defendant may reside, and returned to the court of that county; and it shall be sufficient for the plaintiff to entitle himself to the benefit of such execution to produce before the court to which the same shall be returnable, a short copy of his judgment attested by the clerk. (f)
The course of proceeding prescribed by this act does, in like *667 manner, altogether depend upon the movement of the defendant; and his thus, of himself, laying that foundation of fact which alone can authorize a plaintiff to proceed in the manner pointed out by it. (g) But, as at this time lands were liable to be taken in execution under a fieri facias; and as this act authorizes a plaintiff, in such manner, to sue out any kind of execution he may think proper, it may be considered, that such a judgment would give rise to a lien upon the lands of the defendant, lying in the county to which he had removed, from the time of his having become a resident of it, as well as upon all his lands lying within the jurisdiction of the county court of that county in which the judgment had been rendered. But although it might be so held, in regard to the lands of the defendant lying within those two counties; yet, as, under this act, no execution could be sent to any other county, the judgment could not therefore, operate as a lien upon any lands of the defendant lying elsewhere.
But, whatever doubts or difficulties may have previously existed upon this subject, all, or the greater part of them, have been removed by an act of Assembly, which declares, that the clerks of the county courts shall, on application of the plaintiff in any judgment in their courts, upon return of nulla bona on a fieri facias, in the county where such judgment hath been obtained, issue execution thereon against the goods and chattels, land and tenements of any defendant lying and being in any other county than that in which such judgment was obtained; which execution shall be directed to and served by the sheriff of the county in which such goods and chattels, lands and tenements may be; and that it shall be sufficient for the plaintiff to entitle himself to the benefit of such execution to produce before the court to which the same shall be returnable, a short copy of the judgment attested by the clerk. (h) And it is further provided by another act of Assembly, that the same proceedings may be had upon the return of such execution in the county court of the county to which it has been sent, as if it had been issued on a judgment obtained therein ; and may if necessary be renewed from that court. (i)
These legislative enactments were manifestly and expressly intended, so to enlarge the force and operation of judgments, obtained in the county courts, as to make all the properly of the *668 defendant, wherever it might be found, within any one of the counties of the state, liable to be taken in execution for the satisfaction of such judgments. No execution can be issued, under these laws, against the person of the defendant, to any county, but to that in which he resides, as directed by the previous enactments; nor can a plaintiff be allowed to issue writs of fieri facias directed to two or more counties at the same time, although it may be renewed, or continued, either on the original judgment, or on the short copy of it sent to another county, until full satisfaction has been obtained; in like manner as by a testatum fieri facias issuing, according to the English law, from the Court of King’s Bench to any county of the realm, into which it may be necessary that an execution should go, in order to extract from the property of the defendant that satisfaction to which the plaintiff by his judgment is entitled. And, according to the principles of law which have been applied in all similar cases, as well here as in England, the lands and tenements of the defendant having been thus expressly made liable, by a regular course of proceeding, to he taken in execution, are all, wherever they may be, within any one of the counties of the state, bound by a lien which fastens upon them from the date of any such judgment rendered in any county court. (j)
When these laws, enlarging the operation of judgments rendered in the county courts, were passed, the General Court was in existence, the power of w'hich, as a court of original jurisdiction, extended over the whole state; and from which, as setting on the western or eastern shore, an execution might be sent, upon its judgments, to any one of the counties of the state, against the property of the defendant. The Court of Chancery also, being then, as it is now, and always has been, a court having original jurisdiction over the whole state, having been authorized to enforce its decrees by a fieri facias, directed to any county of the state, against the goods and chattels, lands and tenements of the defendant ; (k) thereby had its decrees likewise made a lien upon the defendant’s lands every where, to the same extent as a judgment of the General Court. (l) And the court of Appeals having been authorized to pronounce such a judgment as the inferior court of common law might have done, and to issue execution thereon to any *669 county of the state, returnable formerly to the General Court; (m) and now before itself; (n) were all alike liens upon the real estate of the defendant every where. Whence it appears, that these last mentioned acts of Assembly; (o) did no more, in effect, than to harmonize our code by giving to all judgments and decrees, whether of the County Court, the General Court, the Court of Chancery, or the Court of Appeals, the same efficacy against the real estate of the defendant in whatever county of the state it might be found; and consequently gave a lien which fastened upon it from the date of such judgment or decree.
If it were at all necessary or expedient to give to the judgments of all the courts of the slate the same pervading efficacy, during the existence of the General Court, when there was a court of common law whose jurisdiction extended over the whole state, and in which a judgment with such a wide spread lien, might have been obtained, it certainly is much more so now, since that court has been abolished; and particularly as the affirmance of a county court, judgment places it in the power of the party to obtain execution from the Court of Appeals, and thus to give to his judicial lien an effect co-extensive with the range of the process of that court. And when it is recollected, that no inhabitant can be arrested or sued in any other county than that in which he resides, it will be seen, that this general operation of the lien, arising from the judgment of a county court, can be attended with little or no inconvenience or hardship to a purchaser, or to any one else; because such a judicial lien can only originate, and therefore must necessarily be found of record in the county court of the county in which the defendant resided at the time of the institution of the suit.
But as a suit may be brought against one who absconds or who is not an inhabitant of Maryland, in any county court of the state, it may be inconvenient to ascertain the existence of a judicial lien upon any lands held by him in this state; it is, however, an inconvenience arising out of the peculiar nature of things, and could not be avoided without very injuriously trenching upon the rule which has established the generality of such liens. These remarks may be applied with the same force to an executor or administrator, supposing him to be bound, as in England, to take notice, at his peril, of all judgments and decrees against his testator or intes *670 tate. (p) But our law, although it directs judgments and decrees to be first paid, expressly protects executors and administrators, who proceed as the law directs, as well from the claims of judgment creditors, as of all others of which they had no notice. (q)
From all that has been said, it is therefore clear, that these judgments obtained by Robert Oliver and by others, to the use of Charles Carroll, in Baltimore County Court, gave them a lien in virtue thereof upon all the real estate of The Cape Sable Company lying in Anne Arundel or any other county of the state.
The act of Assembly by which these defendants The Cape Sable Company, were incorporated, declares, ‘that the lands, tenements, stock, property, and estate of The Cape Sable Company, is and shall be held as real estate, and shall descend as such agreeably to the acts of Assembly in such cases made and provided, when not otherwise disposed of.’ (r) And the trustees who made the sale of their estate under the decree in this case, in their report describe it as consisting of lands, of slaves, of horses, of the implements of the manufactory, &c.; that is, of real estate technically and properly so called, and of mere perishable personalty.
It would seem to be perfectly clear, according to the first branch of this section of the act of incorporation, that this mere perishable personalty is as much a part of that stock, property, and estate of The Cape Sable Company, which it is declared shall be held as real estate, as their lands and tenements; and that it must be so treated as far as practicable, whatever inconveniences may ensue. But it is added, that the estate shall descend as such when not otherwise disposed of; thereby indicating it to have been the intention of the act, that it should only be so held as regarded the interests of the stockholders themselves; and as real estate to descend accordingly from them; not that the actual legal character of the perishable moveables should be changed as well in regard to the rights and interests of all other persons as the stockholders themselves. (s)
It was upon this ground, that I ordered the sheriff’s poundage fees to be rated and ascertained; distinguishing as the law directs, in that respect, between the real and personal property taken in execution. It was upon that ground also, that the injunction in *671 this case operated; by virtue of which the perishable personal property taken in execution was delivered back, as directed by the act of Assembly. And therefore, upon the same principles, that this provision of the act of incorporation has made no alteration in the legal character of the several kinds of property of which the estate of The Cape Sable Company wms composed, it follows, that the liens of Oliver and Carroll can only attach upon their real estate; and that their personal property was only bound from the day of the delivery of the executions to the sheriff.
But that lien upon the personalty was broken and entirely disengaged by the injunction, in virtue of which it was delivered back to the owner. And although the sale under this decree gave to the sheriff a well founded equity, as has been explained, to come here and obtain satisfaction for his poundage fees ; yet I do not perceive any thing in this case which can give to Oliver and Carroll a right to claim a preference in satisfaction out of these proceeds of sale, upon the foundation of that lien upon the personalty which they once held by virtue of their executions, and which has been destroyed by the injunction. Because, upon a dissolution of the injunction the personal property would not be thereby so restored to the custody of the sheriff as to justify him in selling it under the same execution, or to authorize the plaintiff to sue out a venditioni exponas ordering him to sell it; nor can Oliver and Carroll claim any such preference upon the ground of their having been deprived of that advantage by this decree; because it was passed with their express consent, and without the slightest reservation to that effect.
It is therefore, evident, that the claims of Oliver and Carroll to a preference of satisfaction in virtue of their judgments, must, if practicable, be confined to the proceeds of the sale of the real estate of The Cape Sable Company; and that as regards the proceeds of the sale of the personal estate, they can be allowed to take no higher ground than any of the other creditors of the company.
But no one of the parties now here has adverted to this distinction, and objected to the claims of Oliver and Carroll to have satisfaction in preference to all others out of the proceeds of the personalty upon the ground, that they, in fact, had no lien upon the personal estate of The Cape Sable Company after the injunction was served. Why such an objection has not been made, it is not for this court to say. But from the report of the trustees who made the sale under the decree, or from the whole of the proceed *672 ings and proofs, as they now stand, and upon which all parties have united in calling for a decision of the court, it would be utterly impossible to make any such distinction as regards their claim; because it does not appear, nor has the court been furnished with any means of ascertaining what proportion of the purchase money, now about to be distributed, was agreed to be paid for the real estate, and what proportion for the personalty.
Therefore those who have thus stood by, and acquiesced in these two different kinds of the estate of their debtor being undistinguishably blended and mingled, must abide the consequences; and as the rights of these judgment creditors cannot be jeoparded or impaired by any fault, not their own, they must be allowed to obtain satisfaction, to the full extent of their respective liens in preference to all others, from the whole amount now about to be distributed.
These plaintiffs and several of these claimants have, by their exceptions to the auditor’s report, relied upon the statute of limitations as a bar to some of the claims made against The Cape Sable Company. But the statute of limitations, or any other defence, cannot be resorted to by him who has already chosen his defence, rested his case upon it; and suffered the case so to proceed; or had a hearing or decision upon such defence; because if a party were allowed to avail himself first of one defence and then of another, there would be no end to litigation, (t) Therefore all these exceptions against the claims of Oliver and Carroll, must be rejected; even supposing they were now open to such an objection as the statute of limitations, as they are not.
According to the rule laid down for the government of this court, however, a plea of the statute of limitations can only be allowed to enure to the advantage of him by whom it is pleaded, (u) But, if upon this principle the full operation of the plea, or indeed of any other objection, would completely exclude a claim; and yet would afford to him by whom it was pleaded or made, no sort of benefit; either because his own claim could not be sustained, or because, being established, it could not be in any way affected by the allowance or rejection of the claim against which the plea or objection was directed, then it would be tolerating mere wanton mischief to allow such a creditor to disappoint his co-creditor from *673 obtaining satisfaction, when he, himself, could derive no possible advantage from it. For, after the claim of a creditor has been rejected or satisfied, he is, as to the surplus, a mere stranger, and cannot be allowed to interfere with the distribution of it in any way whatever.
Therefore these pleas of the statute of limitations, as well as all other objections, as coming from Oliver, Carroll and O’Hara, and directed against the inferior claims No. 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16, must be entirely overruled.
It is a rule of this court, that in all cases where any one is chargeable under a creditor’s suit as a surety, the creditor must prove the insolvency of his principal debtor before he can be allowed to obtain any satisfaction from the proceeds of the estate of the surety then about to be distributed; and it is enough, as in this instance, that the parties do, in fact and in equity, stand in that relation towards each other; although the contract may not have that aspect, according to the strict and technical rules of the common law. (w) Upon this ground the claim of George Neilson, administrator of James JVeilson, deceased, No. 6, must be rejected, there being no proof of the insolvency of the principal debtors.
An express and distinct acknowledgment of the debt by the debtor himself has, in most cases, been deemed sufficient to prevent the operation of the statute of limitations. Under a creditor’s bill, and in cases of that kind, as this is, although the court will not deny to any one the benefit of any such acknowledgment for the purpose of resuscitating his claim; yet such an acknowledgment will not be permitted to have any such effect where there is just ground to believe, that there has been any collusion in procuring it to be made with a view to injure or lessen the dividends of other creditors. But here, this claim of Eli Balderson, No. 11, is not taken out of the statute of limitations, which has been relied on, as against it, by the plaintiffs, by Lechleitner, and by others, by a mere acknowledgment; but by materials or testimony in its support furnished by the debtor company themselves; and, therefore, this claim must be allowed.
It sufficiently appears from the deed of the 25th of September, 1813, and the proofs referred to by the auditor, that Lechleitner and Troost were the partners, of the second part, of those who constituted the association of Richard Catón, John Gibson and others; *674 and that the partnership, so formed was, by the express stipulation of that déed, to continue for the term of ten years; which term, ■therefore, did not expire until the 25th of September, 1823, after the 5th -of April, 1819, the day on which those who constituted the association of Richard Catón, John Gibson and others, were regularly organized as a body politic, by the name of The Cape Sable Company, under their act of incorporation. (x)
It is true in general, that where a partnership is formed for a definite period of time, it can only be dissolved by the consent of the parties, or by the effluxion of the specified period of time, (y) But, if one of the contracting parties refuses to continue the partnership, or does an act which renders its further continuance impracticable, it must be then terminated; and the only remedy of him who wished its continuance, is upon the contract for a compensation in damages for the injury he has thereby sustained, (z) A partnership for a definite period may be determined before the specified time has elapsed, either by the act of God, as by the death or the habitual mental insanity of one of the partners; or of the government, as by a declaration of war between the countries of the parties; (a) or it may be terminated by the misfortune, or by the illegal or fraudulent conduct of a partner, as by his insolvency or bankruptcy. The partnership is held to be thus absolutely terminated ; because, it is deemed unjust, that the surviving or solvent partner should have a stranger intruded upon him in place of him in whom he had confided, and with whom he had, therefore, associated himself; and also, because it would be in a great degree or altogether' impracticable to continue the partnership after such an event, upon the terms on which it was originally formed. (b)
Here the association, constituted of Richard Catón, John Gibson and others, have virtually refused to continue the partnership they had formed with Lechleitner and Troost any longer, by transferring all their estate to a newly erected body called The Cape Sable Company; and by taking upon themselves the capacities of that •body politic they have virtually and effectually cast off all connexion with their former partners Lechleitner and Troost. (c) By an express provision of the act of incorporation, by which they have *675 been clothed with this new capacity, it is declared, that nothing therein contained should exempt any member, or members of the company from any liability in his, her, or their individual capacity for or on account of any contract or contracts theretofore made.
Hence it is manifest, that their liabilities in their natural capacities, as the association of Richard Catón, John Gibson and others, were to be in no way impaired, or in any manner blended with those of their new and artificial one called The Cape Sable Company. The two being absolutely distinct, and being intended to be kept entirely so. The contracts of the association separately or of the association together with their partners Lechleitner and Troost, could have, of themselves, no connexion whatever with those of The Cape Sable Company. (d) And besides this body politic, as a new and artificial stranger, could not be intruded upon Lechleitner and Troost as a partner in place of the association of Richard Catón, John Gibson and others, with whom they had connected themselves. It is not only an artificial stranger to the partnership formed under the deed of the 25th of September, 1813 ; but it is a corporation of a very peculiar and limited character. It cannot dissolve itself, or dispose of or mortgage its property, or engage in any other manufactory, except that of alum and copperas, without the consent of three-fourths of the stockholders holding three-fourths of the shares; whence it is evident, that it would be impracticable to introduce this body politic as a substitute for the association constituted of Richard Catón, John Gibson and others, and to place it in the same position which that association occupied according to the terms of the contract between that association and Lechleitner and Troost; (e) and therefore the partnership must be considered as having been dissolved on the 5th day of April, 1819, when all the rights and interests of the association were regularly transferred to the body politic.
There is no proof of any contract of partnership between Lechleitner and Troost, or either of them, and The Cape Sable Company, after that day; or of that company’s ever having assumed upon themselves the payment of any debt due from the association to Lechleitner and Troost, or either of them; and consequently, so much of these claims as originated before the organization of The Cape Sable Company; and which is not founded on any express or *676 implied contract with that company itself, must be rejected; and the auditor must be directed to restate the accounts of Leclileitner and Troost accordingly.
Whereupon it is Ordered, that this case be and the same is hereby referred to the auditor, with directions to state an account, in which, after deducting the costs, the trustees’ commissions and expenses, as usual: and the claims heretofore ordered to be paid, he will allow the claim No. 1 of Robert Oliver as a judgment creditor entitled to a preference from the 26th of May, 1824; and Charles Carroll’s claims No. 2,3, 4 and 5, as on judgments entitled to a preference from the 4th of June, 1824; he will then restate the claim of Gerard Troost, No. 14; and also that of Philip G. Lechleitner, No. 15 and 16, rejecting therefrom every portion of them which arose prior to the 5th day of April, 1819; and which is not founded on some express or implied contract with The Cape Sable Company, and which as such may not then be sufficiently authenticated, And these claims, if any such should be ascertained to exist after being thus restricted, together with the claim of Hugh Mullen, No. 9; oí Eli Balder son, No, 11; of Mary Mullen, No. 12; and of Edme Ducatel 8f Sons, No. 13, are to be allowed in due proportion of the residue of the proceeds of sale after the preferred claims of Oliver and Carroll shall have been satisfied according to their respective priorities. And he will reject the claim of George JYeilson, administrator of James JYeilson, deceased, No. 6; the claim of Leonard Foreman, No. 7; the claim of Benjamin Welsh, No. 8; and also the claim of James A. Sangston, No. 10. _
Soon after which the auditor made and reported a distribution of the proceeds as directed by this order, which was confirmed on the 21st of September, 1832; and all the exceptions of the parties at variance with it overruled. A final disposition was thus made of the case; and the corporation called The Cape Sable Company, having been thus totally divested of all its property was thus virtually dissolved, and finally extinguished.

 1818, ch. 193.

 7 Cran. 299.

 3 H. & J. 367.

 2 H. & G. 41.

 2 H. & J. 64.

 Stewart v. Yates. — This hill was filed, on the 22d of October, 18X7, by William Stewart against John Yates, Thomas Armatt, William Brogden, Lewis Duvall, John N. Watkins, and The President, Directors and Company of The Farmers’ Bank of Maryland. The bill states, that some time previous to the 23d of March, 1797, a purchase was made of Allen Quynn by Joseph Watkins, of a tract of land which was conveyed to him accordingly, with an agreement, that Watkins should afterwards convey to the plaintiff a certain portion of it containing about sixty-three acres, which had been previously set apart for him; and which he *616 paid for shortly thereafter; that a deed for the same was soon after prepared, but not executed by Watkins, owing to his negligence, until the 5th of March, 1832; although the plaintiff had, many years before, paid the purchase money; and had, at that time, been in actual possession of the land fourteen or fifteen years. That about the month of February', 1804, the plaintiff purchased of Watkins ninety acres more of the same tract of land, and also a small parcel of another tract, for which the plaintiff agreed to pay five hundred pounds; the whole of which had been long since paid; but for which land he had not obtained a deed until the 5thof March, 1812; although he had had possession thereof, under the contract, seven or eight years. That after the plaintiff had purchased the last parcel of said land, received the possession and paid the purchase money, two several judgments were recovered by the defendant Yates for the use of the defendant Armatt against the said Joseph Watkins; which judgments appear to have been assigned to the defendant Duvall, by him to the defendant John N. Watkins, and by him to the defendant the Bank. That upon the other judgment obtained in October, 1802, by the state for the use of the defendant Brogden, considerable payments had been made, which had not been credited. And that executions had been issued upon those judgments, and laid upon the lands so purchased by the plaintiff. Whereupon this bill prayed for an injunction to stay further proceedings on the said executions so far as related to the said lands'; and for general relief, &c.
22d October, 1817. — Kilty, Chancellor. — The bill is not sworn to, and there is no bond. These defects might be supplied; but, on perusing the bill, I am not. satisfied, that an injunction ought to be issued. It does not appear that the complainant has any interest in the lands against (hat of creditors; or that it is competent for him to enquire into the sum due. If, on the bill being sworn to and bond executed, the counsel should file any observations in'writing they will be considered.
Immediately after which the bill was sworn to; and the plaintiff’s solicitor, in his remarks filed as suggested, referred to and relied upon the case of Hampsen v. Ede. lin, 2 H. fy X 64, in which no bond was required; and he observed, that this was not an application by a defendant at law to stay proceedings on a judgment against him; but to prevent a sale of particular land, because it did not belong to the defendant at law. Upon which the bill was again submitted.
29ft October, 1817. — Kilty, Chancellor. — Since the order of the 22d instant, remarks in writing have been made by the counsel for the complainant, and the case of Hampsen v. Edelin in this court has been referred to. No bond appears to have been required in that case. Whereupon is is Ordered, that subpmna and injunction issue as prayed.
It is to be observed, however, that one of the judgments exhibited was obtained in 1802, before the last purchase of the land; but supposing the complainant to have an equitable interest therein, the other circumstances, stated in the bill, may be sufficient grounds for the injunction, which can be further considered at the hearing of a motion for dissolution.
Cross v. Mullikin. — This bill was filed on the 2d of April, 1824, by Thomas Cross against Benjamin H. Mullikin, William Gwynn of John, William Wilkins» Joseph Wilkins, and George Howard. The bill, after setting forth the facts and circumstances as stated in the following opinion of the Chancellor, prayed for special *617 and general relief; and for an injunction to stay all further proceedings on the said judgment and execution, and also commanding the said Mullikin and Gwynn not to receive the amount of the said judgment until the further order of the court.
To this bill was subjoined an affidavit, made by the plaintiff before a justice of the peace, of the truth of the facts therein set forth in the usual form. Upon which the bill was submitted to the Chancellor.
2d Jpril, 1824. — Johnson, Chancellor. — Benjamin H. Mullikin having endorsed the notes of George Howard, as well as notes of Howard and Beatty, his deceased partner, to a considerable amount, to indemnify him, on the 25th of September, 1817, Howard gave Mullikin a mortgage on a tract of land called Joseph’s Gilt, the conveyance to be avoided on the notes, he had or should endorse, being taken up by Howard, or on his paying to Mullikin whatever sum he might have to pay, in consequence of his indemnity. The notes were not returned by the principal debtors, and Mullikin bad to pay a very considerable sum of money.
William Wilkins & Co. became the endorsers of the notes of Mullikin to a large amount; to indemnify them, Mullikin conveyed the property, the title to which he had acquired by the mortgage from Howard, subject to be defeated on Mullildn’s notes, that were or should be endorsed by Wilkins & Co., being taken up by Mullikin, or on his paying to Wilkins & Co. the amount they should have paid in consequence of their endorsements. The sum of nine thousand dollars appears to have been paid by them, thereby making them the creditors of Mullikin to that extent, the payment whereof was secured by the conveyance to them of the mortgage from Howaid to Mullikin.
Some time after these transfers, and long after they had been duly recorded, Mullikin obtained a judgment, in Anne Arundel County Court, against Howard for $21,786. The judgment was entered on the 28th of October, 1823. Previous to the rendition of the judgment, Howard obtained the benefit of the insolvent laws of this state; and the judgment appears to be subject to the legal effect of the discharge. On the 16th of April, 1823, Wilkins & Co., in consideration of $10,000, conveyed all their interest in the mortgaged premises to Thomas Cross, the complainant, which conveyance was recorded on the 21st of the samo month. Subsequently to the rendition of the judgment, it was entered on the docket of the court in which it was obtained, for the use of William Gwynn of John, one of the defendants.
George Howard, by deeds executed and recorded, has conveyed to the complainant the personal property Howard acquired since his discharge under the insolvent law. Subsequently to all the transfers a fieri facias issued on the judgment, which has been laid on the mortgaged premises, as well as on the personal property; and an application is made for an injunction to prevent the sale of the sheriff. No bond i‘- filed for the prosecution of the injunction.
The first question which presents itself, is, has the complainant presented an equitable foundation for the interposition of this court? Second, if he has, can it be obtained without an injunction bond?
ii r ipears bj- an exception taken to the opinion of the court, on the trial of the cause of Mullikin ®. Howard, that the claim by Mullikin on Howard was not merged by tho mortgage given by the latter to the former; but exisled independent of the mortgage, and the right to recover by a judgment at law remained in Mullikin, no matter to whom he transferred the mortgaged premises. No doubt, if I may be permitted to express a legal opinion, in this, the court was perfectly correct; otherwise, *618 in the event of that property proving deficient, no redress could be had to recover the deficiency if Howard was ever able to meet it. To say the mortgage merged the claim at law would, in effect, be determining the mortgage itself a nullity; for, when it was given no claim existed ; the object of the deed was to secure the payment to Mullikin of whatever sum he might pay, not that he bad paid; it was entirely prospective. But although the legal right remained in Mullikin to obtain a judgment for the money paid by him, it will not follow, that he could not part with his right to receive the money when the judgment was obtained.
All that Mullikin could do was to transfer the property, mortgaged to him by Howard, subject as between him, his assignee and Howard, to the proviso of Howard’s deed. But, as between Mullikin and his assignees Wilkins & Co., subject, to the proviso contained in his, Mullikin’s, deed to them. Of course, all the interest Wilkins & Co. obtained to secure their debt was the extent of Mullikin’s claim on Howard; if that were less than was due to Wilkins & Co., they would have to resort to other funds; if none, must have borne the loss. If their claim, as appears to be the case, were less than the debt due from Howard, and the mortgaged premise.'] were adequate, then the balance would have belonged to, and was subject to Mullikin’s disposal. But, as he had transferred to Wilkins & Co. the claim he had on Howard, to the extent of the claim on him, it was not in his power, equitably, to transfer the whole claim to another person.
Wilkins & Co. appear to have absolutely conveyed to the complainant all their interest; and yet his own property, in the possession of Howard, has been taken in execution to be sold to raise money to be paid to William Gwynn. If Howard himself was able and willing to pay to Mullikin or Gwynn the whole amount of the judgment, on an application to this court, he would be prevented, and only permitted to pay the balance after discharging the debt that was due to Wilkins & Co., or he would be directed to bring it into this court, when asimilar distribution would be njade.
In respect to the bond. This cause cannot be distinguished from that of Stewart v. Yates, (ante 615,) determined by my predecessor, founded on a prior decision. There an injunction issued to prevent property from being sold under a fieri facias issued on a judgment obtained against a third person who held the legal estate in the property intended to be sold, the equitable title being in the complainant. Here an attempt is made against the consent of him who has a right to the whole money to be raised, supposing it not to extend to the debt that was due to Wilkins & Co., to sell his own property. If the complainant has not the legal control of the judgment, he has an equitable, to the extent mentioned, supposing the transfers to him, that are exhibited with the bill to be bona fide; and, prima facie they are so considered; and therefore the injunction prayed for ought to issue; and the register is directed to issue it as prayed.
After which the defendant Mullikin filed his answer, and moved to dissolve the injunction. Upon consideration of which, on the first of January, 1825, the injunction was continued. After which the defendant Gwynn put in his answer, and thereon moved to dissolve; but upon consideration thereof, the injunction was, on the 30th of March, 1825, continued. After which the other defendants having answered, the motion to dissolve was again renewed; but on this third consideration, upon the answers of all the defendants, the injunction was, on the 2d of November, 1825, again continued. After which a commission was issued, and testimony taken. And at the final hearing on the 2dth of July, 182S, the injunction was dissolved, and the bill dismissed with costs.

 Salmon v. Clagett, ante 162.

 Eden. Inj. 66; Jones v. Magill, 1 Bland, 177.

 Co. Lift. 368; 2 Inst. 176, 210.

 23 Hen. 6, c. 9; Kilty Rep. 227.

 29 Eliz. c. 4; Kilty Rep. 85; 3 Geo. 1, c. 15, s. 16; Kilty Rep. 112.

 Peacock v. Harris, 1 Salk. 331.

 The King v. Palmer, 2 East. 411.

 Peacock v. Harris, 1 Salk. 331; Earle v. Plummer, 1 Salk. 332; Tyson v. Paske, 2 Ld. Raym. 1212; Alchin v. Wells, 5 T. R. 470; Rawstorne v. Wilkinson, 2 Mau. & Sel. 256.

 Com. Dig. tit. Viscount, (F. 2.); Woodgate v. Knatchbull, 2 T. R. 148 ; Alchin v. Wells, 5 T. R. 470.

 Selw. N. P. 1286.

 Ridgely v. Iglehart, ante 540.

 Peacock v. Harris, 1 Salk. 331.

 Tyson v. Paske, 2 Ld. Raym. 1212.

 Woodgate v. KnatchbnII, 2 T. R. 157.

 8 Geo. 1, c. 15, s. 17; Tidd’s Prac. 979.

 Biography Sign. Ind. vit. Carroll.

 2 Inst. 533; The Rendsbcrg, 6 Rob. Adm. Rep. 162.

 October, 1777, ch. 10; Declar. Rights, art. 12; 1650, ch. 25.

 October, 1778, ch. 17.

 November, 1779, ch. 25.

 1763, ch. 18, s. 94.

 The act of Assembly authorizing the appointment of a messenger of this court, directs that his fees shall be paid by the party against whom the process issues. — 1785, ch. 72, s. 32. And the same act which gives the Chancellor authority to issue a fieri fating (section 25,) in the direction that ‘upon which there shall be the same proceedings as at law,’ seems to be the only authority for charging poundage fees for levying a fieri facias from Chancery.

 November, 1779, ch. 25, s. 4 and 5; Howard v. The Levy Court, 1 H. & J. 566.

 Stewart v. Dorsey, 3 H. & McH. 401.

 November, 1779, ch. 25, s. 3; 1790, ch. 59, s. 2.

 Maddox v. Cranch, 4 H. & McH. 313.

 Meriton v. Stevens, Willis, 280; Ringgold’s case, 1 Bland, 8.
To the Right Honourable the Lord Proprietary .of this Province; The Humble petition of Thomas Collins sheweth, That whereas your petitioner the last Provincial Court had a verdict given for him against John Watkinson in a plea of trespass and ejectment; which said verdict and the judgment thereupon is, this court arrested on a suggestion grounded only on the juror’s own confession, that he, one of the jury, Evan Carew by name, was an alien; when, if that were true, yet ought the plaintiff Watkinson to have challenged him for that; for which reason your petitioner humbly prayeth your Lordship's writ of error, returnable the next Assembly, to correct the said judgment-. And your petitioner shall as in duty bound ever pray, &c.
3d April, 1683 —C. Baltimore. — To the chief clerk or register of the Chancery-Court of Records. Let a writ of error be granted as is prayed; the petitioner giving good and sufficient security according to the act of Assembly in that case provided.
Writ of error, supersedeas, and scire facias then issued, according to the aforegoing petition and order, 3d April, 1683. — William Cocks, register. — Chancery Proceedings, lib. C. D.fol. 368.

 Eden. Inj. 238; Murdock’s case, 2 Bland, 470.

 Franklyn v. Thomas, 3 Meriv. 234.

 1826, ch. 157.

 Howard v. The Levy Court, 1 H. & J. 566.

 Blacklock v. Maddox, 2 Harris’ Entries, 694; Cockey v. Chapman, 2 Bland, 83, note;—, 6 Peters, 658.
Boyce v. Bratiford. — February, 1720. — Mr. Daniel Dulany appears with liberty to move for a dissolution of the injunction next court. And forasmuch as the complainant has given good and sufficient security in forty-six thousand pounds of tobacco in the case here depending between the said complainant and defendant. Therefore Ordered, by the Chancellor, that Mr. Sabret Sollers, high sheriff of Calvert county, let the complainant have liberty to make use of the tobacco in the said sheriff’s hands, as he the said Boyce shall see occasion. — July, 1821. — Answer with liberty to move for a dissolution of the injunction this court. — July, 1723. — Exceptions filed to the answer, to be argued last court. For answer this court — Argued and adjudged good. — Ruled, that the defendant make a better answer, and pay the complainant 800 pounds of tobacco, costs, as well on the overruling the exceptions aforesaid, as for scandal in the answer alleged. Further answer to be filed according to rule.— Chancery Proceedings, lib. P. L. fol. 568, 672, 887.

 1799, ch. 79, s. 10.

 Bond v. Cooper, 6 November, 1826. — Per Bland, Chancellor.

 Frankly v. Thomas, 3 Meriv. 234.

 Bac. Abr. tit. Corporation, E. 2; Adley v. The Whitstable Company, 17 Ves. 316; S. C., 1 Meriv. 107.

 The King and Queen v. The Mayor of London, 12 Mod. 17; S. Ca. 1 Show. 274; Com. Dig. tit. Franchises, (G. 5.)

 Co. Litt. 85; Vattel, b. 1, c. 7.

 Co. Litt. 55; Land Ho. Assis. 121.

 2 Inst. 18, 894; Gilb. Execution, 3; Gilb. Co. Exch. 123; 7 Petersdorffs, Abr. 527, note; Code Napoleon, by Barret, Introd. 328; 3 Southern Review, 30, 31; Bowaman v. Reeve, Prec. Chan. 577; Anonymous, 9 Mod. 66.
The English statute of 1285, (13 Ed. 1, c. 18,) which gave the elegit, by which all the debtor’s personalty, or a moiety of his lands might be taken in execution, in favour of husbandry, excepts his oxen and beasts of the plough.
By an act of the Provincial government, it is set forth, that ‘whereas many of the inhabitants of this province are and have been exceedingly grieved and burthened by executions laid upon them in the summer time, when it is not possible for them to procure effects for the payment and satisfaction of their creditors, by means whereof they are often times kept in prison a long time, and thereby disabled from making and tending their crops, to the great prejudice, if not ruin, of many of the inhabitants of this province, being thereby left destitute of any means to satisfy their creditors.’ — 1715, ch. 33. — And by another act it is declared, that no slave shall be sold by any administrator for the payment of debts; nor any execution served upon any slave so long as there shall be other goods of the deceased sufficient to satisfy the debt, but shall be kept and employed tor the benefit of the creditors and orphans, until the crop begun in the life-time of the deceased, shall be finished. — 17J5, ch. 39, s. 8.
By a British statute passed about the year 1816, for the purpose of regulating the execution of legal process, so as to be consistent with good husbandry, it is enacted, that the sheriff shall not carry off, or sell for the purpose of being carried off from any lands, let to farm, any straw, threshed or unthreshed, or any straw of crops growing, or any chaff, colder, or any turnips, or any manure, compost, ashes, or sea-weed, in any case whatever; nor after notice, any hay or vetches, nor any roots or vegetables being the produce of such lands, where, according to any written agreement with the landlord, the same is to be expended thereon ; but shall sell the same under certain regulations, to be there used and expended, according to the custom of the country; or according to the written agreement, as the case may be. And by the sixth section of this statute, all crops and produce so sold, and all cattle and implements of husbandry employed and used in and about the same, are protected from distress. — 56 Geo. 3, c. 50; Bradby on Distress, 84; Watson on the Office of Sheriff, 180.

 Doe v. Witherwick, 11 Com. Law Rep. 8; Rawlings v. Carroll, 1 Bland, 75, note; Dorsey v. Campbell, 1 Bland, 364; Tyson v. Hollingsworth, 2 Bland, 334, note.

 5 Geo. 2, c. 7 ; Coombs v. Jordan, ante 284.

 Hanson v. Barnes, 3 G. & J. 367; Osborne v. Woodson, 1 Haywood, 24.

 Hammond v. Hammond, 2 Bland, 347; Clanmorris v. Bingham, 12 Cond. Chan. Rep. 253.

 Clerk v. Withers, 6 Mod. 299.

 November, 1779, ch. 25, s. 4 and 5; 1790, ch. 59; 1813, ch. 102, s. 5 and 6.

 Welch v. Stewart, 2 Bland, 38.

 Rankin v. Scott, 12 Wheat. 177.

 Hammond v. Hammond, 2 Bland, 316; Shepherd v. Towgood, 11 Cond. Chan. Rep. 206.

 2 Inst.703; Rex v. Gardner, Cowp. 83; Society, &c. v. Wheeler, 2 Gall. 131.

 Gilb. Com. Pleas, 228; 1 Harr. Pra. Chan. 263.

 1797, ch. 70, s. 24. It has been since declared, that where a scire facias may be ordered against a corporation to shew cause why its charter should not be vacated, the writ shall issue out of the county court of the county which shall be used by it for keeping its place of business in, &c. — 1832, ch. 306, s. 3.

 1818, ch. 195, s. 2.

 1714, ch. 4, s. 2; 1728, ch. 24, s. 2; 1796, ch. 43, s. 14; 1801, ch. 74, s. 11.

 Coombs v. Jordan, ante 284.

 1823, ch. 194.

 Coombs v. Jordan, ante 284.

 Harris v. Saunders, 10 Com. Law Rep. 373.

 Kames’ Prin. Eq. b. 3, c. 7 and 8.

 Tidd’s Prac. 370; Mortyn v. Fabrigas, Cowp. 176.

 Tidd’s Prac. 929,938; 1 Sellon’s Prac. 518.

 1 Sellon’s Prac. 519.

 Com. Dig. tit. Execution, (I. 1); Holt v. Murray, 2 Cond. Chan. Rep. 243.

 Guilliam v. Hardy, 1 Ld. Raym. 216; Cowperthwaite v. Owen, 3 T. R. 657; 2 Harris’ Entr. 766.

 F. N. B. 246 ; 2 Inst. 23; Bac. Abr. tit. Execution, B. I. 2; Holt v. Murray, 2 Cond. Chan. Rep. 243; 19 Geo. 3, c. 70, s. 4, (1779;) 1835, ch. 201, s. 10, 11 and 12.

 Kames’ Prin. Eq. b. 3, c. 8, s. 1; Utterton v. Tewsch, 3 Eccle. Rep. 351; Gordon v. Pye, 3 Eccle. Rep. 450, 463.

 1714, ch. 4.

 1773, ch. 17.

 1728, ch, 24; 1796, ch. 43, s. 14; 1801, ch. 74, s. 11 — Where the suit abates by the death of a defendant, his executor or administrator may, to revive the suit, be summoned from any other county of the state. — 1812, ch. 145, s. 4. And as it would seem a party may be arrested by virtue of an attachment any where in the state and brought before the High Court of Chancery.— Crapster v. Griffith, 2 Bland, 15.

 1 Sellon’s Pra. 536; Bullock v. Morris, 2 Taunt. 67; Waters v. Caton, 1 II. & McH. 407; Coombs v. Jordan, ante 321.

 1715, ch. 41, s. 8, probably reenacted from 1701, ch. 1.

 2 Inst. 23; Guilliam v. Hardy, 1 Ld. Raym. 216,

 5 Geo. 2, c. 7.

 October, 1777, ch. 12, s. 3.

 Harden v. Moores, 7 H. & J. 4.

 1784, ch. 54, s. 9.

 1795, ch. 23, g, 1; Harden v. Moores, 7 H. & J. 4.

 Ralston v. Bell, 2 Dall. 159; Eppes v. Randolph, 2 Call. 186; Nimmo v. The Commonwealth, 4 Hen. & Man. 77.

 1785, ch. 72, s. 25.

 Coombs v. Jor. dan, ante 284.

 1800, ch. 69.

 1810, ch. 156.

 1794, ch. 54; 1795, ch. 23.

 Searle v. Lane, 2 Vern. 88; Nimmo v. The Commonwealth, 4 Hen. & Mun. 57.

 1798, ch. 101, sub ch. 8, s. 15, 17; 1802, ch. 101, s. 8.

 1818, ch. 195, s. 8.

 Binney’s case, 2 Bland, 146.

 Bennet v. Lee, 2 Atk. 529; Welch v. Stewart, 2 Bland, 37.

 McCormick v. Gibson, ante 499, note.

 Watkins v. Worthington, 2 Biand, 509.

 1818, ch. 195.

 Collyer Part. 57.

 Skinner v. Dayton, 19 John. 538.—

 Griswold e. Waddington, 15 John. 57.

 Collyer Part. 58; Marquand v. The New York Manufacturing Company, 17 John. 525.

 Bethel Church v Donnom, 1 Desau. 154.

 1 Font. Eq. 308 ; Dance v. Girdler, 1 New Rep. 35.

 Marquand v. The New York Manufacturing Company, 17 John. 525.